THE BLACK RIVER IMPROVEMENT COMPANY vs. THE LA CROSSE BOOMING & TRANSPORTATION COMPANY and others.

*January 20 — May 10, 1882.*

CORPORATIONS: NAVIGABLE RIVERS: RIPARIAN OWNERS. *(1) Plaintiff's powers under its charter.  (2) Its right to take lands of state without compensation.  (3, 4) Subsequent purchasers from state bound.  (5) Rights of riparian proprietors as against the state or its agents.*

Plaintiff's charter empowers it " to improve the navigation of the Black River and lakes near the mouth " thereof, in counties named, " by removing obstructions, *building dams*, breaking jams, deepening, widening and straightening the channel, *closing up chutes and side-cuts* leading from said river into the Mississippi river, and into the bottom lands of said river, and into sloughs; to erect booms and piers, *construct*

*levees and dykes,* and repair and straighten the banks of said river," etc. It further declares that said charter "shall be deemed a public act, and its provisions shall be liberally and favorably construed." *Held,*

1. That plaintiff took power under such charter, for the purpose of improving the navigation of Black River, to close by a dam the entrance of Black Snake River, which diverges from the main channel of Black River and rejoins it at a lower point, such stream being in the nature of a slough, and the entrance thereto a chute or side-cut, within the meaning of the act; and this, although said Black Snake River was a navigable stream.

2. That said charter (which required compensation to be ascertained and paid for any lands taken from private owners, but contained no such provision in respect to lands belonging to the state), by implication authorized the plaintiff to take, for the purpose of improving the navigation of said river in the manner provided, any lands of the state without compensation.

3. That persons who purchased lands from the state *after* the erection of dams and embankments thereon by plaintiff, as authorized by the charter, took subject to plaintiff's right thus acquired.

4. That where such an embankment was made by plaintiff upon land held by contract of sale from the state, with the consent of the purchaser, and such land was afterwards forfeited to the state and resold, the subsequent purchaser took subject to plaintiff's right.

5. That riparian owners on a navigable stream cannot recover damages for a diversion of the water by the state, or by a corporation acting by authority of the state, for the improvement of the navigation. *Arimond v. Green Bay & M. Canal Co.,* 31 Wis., 316, and *Delaplaine v. C. & N. W. Railway Co.,* 42 Wis., 230, distinguished.

APPEAL from the Circuit Court for *La Crosse* County. The case is thus stated by Mr. Justice Taylor:

" The plaintiff and the principal defendant in this action are corporations; the first organized under a special law of the state, and the second under a general law — chapter 144, Laws of 1872. The action is brought for the purpose of restraining the defendant company and its officers and agents from interfering with the property and franchises of the plaintiff company.

" The plaintiff was incorporated and derives all its powers and franchises from chapter 84, P. & L. Laws of 1864, amended by chapter 447, P. & L. Laws of 1866. The powers

JANUARY TERM, 1882. 661

The Black River Imp. Co. vs. The La Crosse Booming & Trans. Co. et al.

conferred upon it are declared in section 1 of said chapter 84, Laws of 1864. After giving the names of certain persons as corporators, the act declares, "that they shall be and are hereby created, in accordance with the provisions of this act, a body corporate and politic, by the name and style of the Black River Improvement Company, and by that name shall have succession and continue for twenty-five years, *and shall have power and authority*, and they are hereby authorized and empowered, to improve the navigation of the Black river, and lakes near the mouth of the same, in the counties of Clark, Jackson, Trempealeau and La Crosse, in the state of Wisconsin, by *removing obstructions, breaking jams, deepening, widening and straightening the channel, closing up chutes and side-cuts leading from said river into the Mississippi river and into the bottom lands of said river, and into sloughs; to erect booms and piers, to construct levees and dykes, and repair and straighten the banks of said Black river,* and to contract and be contracted with, sue and be sued, implead and be impleaded, in all courts of law and equity whatever, and make and have a common seal," etc. The amendment made to this charter by chapter 447, Laws of 1866, simply added the words "building dams" after the word "obstructions" in said section. The ninth section of the act gave the corporation the power to charge certain tolls upon logs, timber and lumber run on said river, after expending in such improvements certain sums of money mentioned therein.

"The defendant corporation was organized under chapter 144, Laws of 1872, and in the articles of association the powers of the corporation were stated as follows: 'For the purpose of manufacturing, by steam or water-power, within the county of La Crosse or elsewhere, lumber, lath, pickets, timber and all other products of wood material for market, and to purchase and sell timber, lumber, logs and all other wooden materials and products, and all such merchandise as may be necessary in such business; *and also of improving Black river and sloughs*

*for navigation, from John Lytle's mill on said river to its mouth and entrance into the Mississippi river by way of the main river and Black Snake river and French slough, for the purpose of booming, driving, rafting, holding and manufacturing logs, timber and other wooden materials for the use of the company or of other persons,* and to purchase and sell all such materials and real estate as said company may deem expedient; also of transporting property of all kinds on the Mississippi river and tributaries by vessels and water-craft, and to purchase and charter all necessary vessels for towing purposes, as common carriers or otherwise, upon the Mississippi river and its tributaries, and to charge a reasonable compensation therefor for all booming, rafting, manufacturing, transporting and towing or other services for other persons, *and with power to construct such improvements in said streams by way of improving the navigation of the same, and such booms, piers, piles, assorting works, rafting works, holding grounds for materials,* and purchasing and leasing such real estate as said company may need.'

"The principal controversy in this case grows out of the attempt of the defendant company to keep open what in their articles of association is called the Black Snake river, and to improve the same for purposes of navigation. The evidence shows that what is called the Black Snake river is, in the original plats of the United States survey, called the West Branch, and is in fact a part of the waters of the Black river. The water constituting the Black Snake leaves the channel of the Black river at a point below Lytle's mills, and runs to the west of the main channel of the Black river through low grounds for about two miles, and then empties into what is called Rice lake. The main channel bears to the east and empties into the same lake. From that lake to the Mississippi, in an ordinary stage of water, all the waters of the Black river flow in one stream to the Mississippi. The West Branch or Black Snake was returned as a meandered stream on the government surveys

from the point where it leaves the Black river to Rice lake, and in its original state it was useful for the purpose of running logs, as deep or deeper than the main channel, but not as wide and more tortuous in its course. The evidence in the case shows that the plaintiff corporation, as soon as organized, and before 1866, closed up the Black Snake river at its upper end, where it first leaves the Black river, for the purpose of turning its waters into the main channel, in order to increase the volume of water in that channel. It also shows that the west bank of the Black river, immediately above the point where the Black Snake departed from the main channel, was low, so that whenever there was any considerable rise of water in the river it overflowed that bank and passed off into the low lands between the river and the Mississippi, and did not return again into the Black river; and that the plaintiff corporation, in order to prevent this overflow and increase the volume and depth of water in the Black river, built a dyke or embankment on the west bank of Black river, from the mouth of the Black Snake north, for the distance of a half mile or more; and that this embankment was maintained by the plaintiff corporation, as well as the dam or obstruction which prevented the flow of water from the Black river into the Snake river, from the time they were built until after the organization of the defendant corporation in 1876. The evidence also shows that the defendant corporation, immediately after its incorporation, broke down the dyke of the plaintiff on the west bank of the river, near the place where the waters of the Black Snake left the main river, so as to permit the waters to flow into the Black Snake channel the same as it did before the plaintiff's improvements were made, and has since continued to keep open the breach in said dyke or embankment.

"In order to present the material questions in the case it will not be necessary to review the testimony to any extent, as the findings of fact and the conclusions of law drawn therefrom by the learned circuit judge present the real questions con-

cerning which there is any dispute. The findings of fact are very full, and as to the material matters there is no great dispute as to their general accuracy. If the learned circuit judge has erred in the matter, the error is in the conclusions of law which he draws from such facts. We will therefore omit from this opinion the findings of fact, and insert merely the conclusions of law as the basis of our views in examining the correctness of the conclusions arrived at by the learned circuit judge. The following are the conclusions of law as declared by the circuit judge:

" '(1) That the channel called Black Snake is a part of Black river, and is a public highway.

" '(2) That the plaintiff's charter did not authorize the plaintiff to close up Black Snake channel, so as to destroy its navigability, nor so as to prevent its use by the public as a highway.

" '(3) That the owners of the Black Snake channel have, as an incident to such ownership, the right to have the waters of Black river flow past their land as it was accustomed to flow, the right of access to the navigable waters of Black river from their own banks, and the right to land their own logs and property from the navigable waters of the river upon their own banks. The plaintiff has not and had not the right to close up the Black Snake channel, nor to prevent the natural flow of the water therein, so as to destroy the rights of riparian owners upon that channel; nor to erect or maintain levees or embankments on the banks of Black river, without making compensation to the riparian owners.

" '(4) That the plaintiff's proceedings for the condemnation of several tracts of land, as described and set forth in the complaint, were abandoned, and gave the plaintiff no right in such lands.

" '(5) That there is nothing in plaintiff's charter which forbids the riparian owners upon the Black river, or upon any of its navigable channels, the right to maintain in the

stream, in front of their own banks, suitable booms, piers, assorting and rafting works, in aid of the navigation of the stream with logs, at their peril only of obstructing navigation. The construction of such works by riparian owners is not an invasion of the plaintiff's rights under its charter.

" '(6) That the defendant the *La Crosse Booming & Transportation Company*, being the owner of both banks of the Black Snake channel, had and has the right to maintain in front of its banks on that channel, in aid of the navigation of the Black river with logs, suitable booms, piers and rafting works, and the right to float its logs into and along that channel to its booms and rafting works. In the lawful exercise of those rights it might lawfully remove the obstructions placed there by the plaintiff, without lawful right, which prevented such use of the channel.

" '(7) That it does not prejudice the plaintiff that the defendant cut the embankment at a place other than the meandered channel.

" '(8) That the defendant the *La Crosse Booming & Transportation Company* may lawfully, as against the plaintiff, maintain and operate in the Black river, in front of its own banks, suitable and sufficient assorting works to enable it to separate its own logs from the logs of other owners.

" '(9) That the plaintiff, being neither the owner nor driver of logs, is not injured by the detention of logs occasioned by the maintenance and operation of defendant's assorting works. If such works are or should become an obstruction to the navigation of the river with logs, that fact gives the plaintiff no right of private action.

" '(10) That although the low land or depression between Rice lake and French lake is not a natural water-course between the two lakes named, yet it is not unlawful, as against the plaintiff, for the defendant to run its rafts of logs from its rafting works in the Black Snake channel to the Mississippi river by that route.

" ' (11) That the plaintiff has no cause of action against the defendants, and the complaint should be dismissed, with costs to the defendants.' "

From a judgment in accordance with this decision, the plaintiff appealed.

For the appellant there were briefs by *Burton & Woodward*, with *Gregory & Gregory*, of counsel, and by *S. U. Pinney* of counsel, and oral arguments by *Mr. Pinney* and *J. C. Gregory*.

For the respondents there were briefs by *M. P. Wing* and *G. C. Prentiss*, with *G. W. Cate*, of counsel, and oral argument by *Mr. Prentiss*. Among other things, they contended that, in the absence of a specific grant of power to close up the navigable waters of the state, the general policy of the law in regard to these waters should control, especially in cases of doubtful construction. Unless such power has been granted in unmistakable terms, it will be held not to exist. See R. S., sec. 1777; *Enos v. Hamilton*, 24 Wis., 661; 37 id., 446; 41 id., 584; 3 Blackf., 193; 6 McLean, 237, 207. Even if its charter be construed to authorize the permanent closing up of the west branch of the river, the plaintiff could not do so without making compensation to the riparian proprietors. Every man purchasing or occupying lands on the navigable waters of the state, purchases and occupies subject to the superior right of the state to improve such rivers and regulate the flow of the water in the interest of the public; and therefore, for any occupation of the stream within the banks by the public for the public use, the shore owners have no right to claim compensation. But the improvement of a river, and its use and appropriation for purposes of navigation by the public, are one thing, and its permanent destruction by damming the water out of it is another. *Pumpelly v. G. B. Co.*, 13 Wall., 166; *Gardner v. Newburg*, 2 Johns. Ch., 162; 2 McLean, 378–382; *Arimond v. G. B. & M. Canal Co.*, 31 Wis., 316; *Chapman v. O. & M. R. R. Co.*, 33 id., 629; *Del-*

JANUARY TERM, 1882. 667

The Black River Imp. Co. vs. The La Crosse Booming & Trans. Co. et al.

*aplaine v. C. & N. W. R. W. Co.*, 42 id. 214. In this case the plaintiff not only deprived the riparian owners on the west branch of all uses of the water of the stream, but actually constructed the dam for that purpose on their lands without any compensation. Such appropriation of the river and of the lands necessary to the dam was without authority of law, and the defendants had the right to remove the dam.

The following opinion was filed February 7, 1882.

TAYLOR, J. It will be seen by the conclusions of law above recited, as well as from the very able opinion of the learned circuit judge, which he filed upon the determination of this case, and especially by a subsequent opinion delivered by him in the case of the *Black River Flooding Dam Association v. Ketchum*, *ante*, p. 313, that the learned judge held that the right of the appellant corporation, under its charter to improve the navigation of the Black river within the limits prescribed by the charter, in the manner and by the methods designated therein, were not repealed by the enactment of chapter 144, Laws of 1872, under which the defendant's incorporation was perfected, nor by the similar provisions of law reënacted in the Revised Statutes of 1878; and that no association or corporation formed under chapter 144, Laws of 1872, as amended by chapter 399, Laws of 1876, or by section 1777, R. S. 1878, was authorized to interfere with any works of the appellant, lawfully constructed under its charter, for the improvement of said river, or to make any improvements in said river within the limits prescribed in the appellant's charter, of a like character to those authorized by that charter. The learned judge held, as we understand from said opinion, that within the limits of the appellant's charter the right to improve the navigation of the Black river in the manner and by the means designated therein was exclusive, and that no other company or corporation organized under said general laws would have the right to make improvements of a similar kind

and charge any tolls for the use of such improvements during the continuance of the appellant's charter, or until the same was revoked by the legislature, or the franchises were declared forfeited by a court of competent jurisdiction. In respect to this part of the decision of the learned circuit court, certainly the appellant 'has no reason to complain; and, as it does not appear that any exceptions were taken by the defendant corporation, either to the findings of fact or conclusions of law, so far as the matters above stated are concerned, they must be taken as the law of the case upon this appeal.

The material questions arising upon the findings in this case are two: *First.* Had the appellant the right, under its charter, to close up the Black Snake for the purpose of turning its waters into the main channel, in order to improve the navigation of that channel? *Second.* Was it lawful for the corporation to close the Black Snake channel for such purpose, without first making compensation to the riparian owners along the line of the Black Snake for any injury they might sustain by the diversion of its waters from its natural course into the main channel?

The other questions, as to the right of the riparian owners on the Black river to maintain in front of their lands booms and piers, assorting and rafting works, not obstructing navigation thereby, or interfering with the appellant's improvements, need not be discussed or determined in this opinion. The learned circuit judge determined both of the questions above stated in the negative, and, as we understand it, determined the case against the appellant because its acts in these respects were void, and the appellant had no ground for complaint by reason of the acts of the defendant corporation, because such acts were lawful.

Upon the first point the learned circuit judge determined that under the provisions of the appellant's charter it had no right to close up the Black Snake or West Branch, because it was a navigable stream when and before the charter was granted

to the appellant, and that it does not come within the language of the act. The language of the act is: "They shall have power, and they are hereby authorized and empowered, to improve the navigation of the Black river, and the lakes near the mouth of the same, . . . by removing obstructions, building dams, breaking jams, deepening, widening and straightening the channel, closing up chutes and side-cuts leading from said river into the Mississippi river and into the bottom lands of said river and into sloughs, to erect booms and piers, to construct levees and dykes, and repair and straighten the banks of said Black river." It is said that, strictly construed, these words do not authorize the closing up of the Black Snake, because it is neither a chute nor side-cut leading from said river into the Mississippi river, or into the bottom lands of said river, or into a slough. It will be seen that there is no prohibition, in the words granting the power to close up chutes and side-cuts, against closing up navigable chutes and side-cuts. There can be no inference, therefore, drawn from the words used, that it was not the intention of the legislature to grant the power of closing up navigable waters of the kind specified, if it became necessary to do so in order to make improvements in the navigation of the Black river, which was the purpose of the grant of power. The evidence, in fact, shows that there were chutes and side-cuts which were sometimes navigable for running and rafting logs in the vicinity of the Black Snake, which came clearly within the terms of the charter, and which might therefore be closed under the power granted. It is possible that, within the rules of law which require a strict construction of the language conferring powers upon corporations, the Black Snake might not be included within the grant of power. But it is evident the legislature did not intend that this rule should apply to this charter, because in section 14 it is declared that the act "shall be deemed a public act, and its provisions shall be liberally and favorably construed." These words evidently mean that it shall be liberally and favorably

construed for the accomplishment of the purposes of the act, viz., the improvement of the navigation of the river. The provision of the act authorizing the building of levees, dykes and dams clearly indicates that one of the proposed methods for improving the navigation of the river was by confining the channel where it had a tendency to spread out into a shallow stream so as to be incapable of floating logs and timber; and the authority to close side-cuts and chutes was evidently for the same purpose, as well as for the purpose of preventing the logs and timber leaving the channel in high water and floating off into the low grounds and timber lands adjoining the west bank, and between that and the Mississippi river. The twenty-third finding of fact shows the character of the land between the west bank of the Black river and along the Mississippi river; and the twenty-ninth finding of fact shows "that in times of low water in the Black river there is not sufficient water to navigate both the Black Snake and the east channel fully; but that the said Black river is ordinarily subject to periodical rises, attributable to natural causes, occurring annually, and during such periods of high water both the Black Snake and the east channel are fully navigable for rafts and logs." How long this high water continues in each year, when both channels can be navigated, is not found by the learned judge.

Although there is no finding upon that subject, the evidence shows that what is called the Black Snake was a narrow stream compared with the main river, but deeper than the main channel in most of its course; that it ran through low ground, its course was crooked, and in high water it would spread out so as to make it difficult to tell where the channel was. One witness for the defendant says that where the Snake left the main river it was about 60 or 70 feet wide, and the main river about 150 feet wide. Other evidence shows that the average width of the Black Snake was about 70 feet, and that of the main channel about 140 feet. The evidence also shows that for some

distance above where the waters of the Black Snake left the main channel, the west bank was low, so that, when there was any considerable rise in the waters of the river, it overflowed that bank and passed into the Black Snake, and into the low grounds adjoining it. One of the defendant's witnesses, Mr. Robert Douglass, testifies that in an early day, when he passed up the Black Snake, there were three openings from that river into the main river; that they were deep enough to float a canoe, but not deep enough to float a raft; and that the three came together and made the Snake about thirty or forty rods from the place where they left the main river; and that, in order to get from the Snake to the river, they had to cut away the trees which hung over the opening. It will also be seen from an examination of the testimony, that very many of the witnesses call the openings from the river, through which the waters flowed to form the Snake, " chutes." The witness Douglass says there were three " chutes " there coming out of the Black river, which, uniting, formed the Snake. The other witnesses apply this same term to these openings. It would seem, from all the evidence in the case, that the waters which formed the Black Snake escaped over the low banks on the west side of the Black river in high water, and formed channels which in low water were shallow where they left the river; and that, after flowing a short distance, they united in low ground and formed the channel of that river; that they followed in this channel down to Rice lake, in which the main channel of the Black river also flowed; and that from there the waters of both streams again united, and flowed by one channel to the Mississippi through dry ground.

We think the evidence also shows that the closing of the Black Snake was a reasonable means of improving the navigation of the main channel. The power given the appellant corporation to build levees, dykes and dams, shows very clearly that the act contemplated the use of these levees, dykes and dams for the purpose of confining the waters of the river within

the channel, and preventing its overflow and spread into the low grounds along its shores, so that the logs and timber coming down the same should be prevented from floating off into the grounds adjacent, and be with more certainty confined within the banks of the river, and so safely floated to its junction with the Mississippi. A reasonably liberal interpretation of the words "chutes" and "side-cuts" would include the openings from the main river into the Black Snake, and if it be objected that these chutes or side-cuts did not lead the waters from the Black river into the Mississippi, still we think it is not straining the meaning of the act to say that the chutes or side-cuts from the Black river to the Snake river lead the waters of said Black river into the bottom lands of said river and into sloughs. From the nature of said Snake river, and the grounds through which it passes, and because it again returns into and mingles its waters with the main river, it might well be termed a slough within the meaning of said act, although, perhaps, not strictly a slough according to the definition of lexicographers. But as the work "chute" has come to mean in the common language of our river men any opening in the banks of a stream where a part of its waters diverge from the main stream, irrespective of the question whether it flows out with a rapid or slow current, so where a part of the waters of a stream in its downward course diverges from the main channel, and returns to it lower down, it is usually called a slough, and especially if in its separate course it runs with a slow current and through low grounds. It was said by the late learned Chief Justice RYAN, in his opinion in the case of the *Stevens Point Boom Co. v. Reilly*, 44 Wis., 302, that "in rivers like the Wisconsin it may not be always easy to determine which is the main channel and which is the slough. And, indeed, the natural action of the waters of the river may, from time to time, alter the character of its channels, making what was before a slough the main channel, and what was before the main channel a slough." In using this language he used

the word "slough" as including a side-cut like the one in question in this case; and he clearly understood the word "slough" to mean a channel diverging from the main channel, and returning into it again at a lower point, making the word "slough" include such side-cut, irrespective of the character of the ground through which it passed, or the velocity of its current. We know, as matter of history, that streams diverging from the main stream, whether returning into it again or forming a distinct·outlet for the waters of a river into some other body of water, are called sloughs, even though navigable for steamboats. There are two or more such sloughs at the mouth of the Chippewa river, which have become somewhat noted in the courts of this state as well as of the United States. We are clearly of the opinion that a fair and just construction of the appellant's charter gave the corporation the right to close the entrance to what is termed Black Snake river. It was nothing more than closing up the chutes and side-cuts which lead the waters of the Black river into the bottom lands and sloughs adjoining the same.

The learned circuit judge before whom this case was tried, seemed inclined to hold that the language of the statute did not give the right to close the Black Snake, because it was a navigable stream, and not covered by the words "chutes or. side-cuts leading," etc. We think in so holding he gave too. strict a construction to the powers of the corporation.

The learned judge further held that if the charter did grant the power to close up the same, the plaintiff had no right to: do so without first making compensation to the riparian owners along the banks of the Black Snake river, nor to maintain levees or embankments on the banks of the Black river without making compensation to the riparian owners. In his· third conclusion of law he says: "The owners of the. Black Snake channel have, as an incident to such ownership, the right *to have the waters of Black river flow past their land as it was accustomed to flow, the right of access to the navigable*

*waters of the Black river from their own banks,* and the right to land their own logs and property from the navigable waters of the river upon their own banks.    The plaintiff has not and had not the right to close up the Black Snake channel, nor to prevent the natural flow of the water therein, so as to destroy the rights of riparian owners upon that channel; nor to erect or maintain levees or embankments on the banks of Black river without making compensation to the riparian owners." And because it was not claimed by the plaintiff that it had made any compensation to the owners of the land along the Black Snake, or to the owners of the shore of the Black river where it maintained its dyke or levee, he held that the defendant corporation had the right to remove such dyke or levee in order to turn the waters of the Black river into the Black Snake channel to the same extent that they ran through said channel before the plaintiff's levee and embankment were made.

The place where the levee or embankment was opened by the defendant corporation, was on lot 6 or 7, section 22, town 17 N., range 8 W.    The learned circuit judge, in his findings of fact, does not determine upon which lot the levee or embankment was opened by the defendant; and from the evidence returned *it is difficult to determine whether it was on* lot 6 or 7 of said section; and for the purpose of this action it is not material upon which of the two it was made.    Lot 6 was, at the time the embankment or levee was made, swamp land, and was owned by the state down to the year 1875; and lot 7 had then been contracted to be sold to one McMillan, who continued to own and possess the same until 1874, but was afterwards forfeited to the state, and the state again sold said lot, January 22, 1875, to Benjamin E. Edwards, and Edwards conveyed the same to the defendant *Polleys.*    And the circuit judge finds that the plaintiff erected and maintained the embankment and dyke on said lot 7 with the full knowledge and consent of the owner, McMillan, from the time the

same was built down to the year 1874, when it was forfeited to the state.

The learned circuit judge seems to place the right of the defendant company to remove the embankment upon two grounds: *first*, upon the fact that said company was the owner of the lands upon which it was situate at the time the embankment was removed, and because it was placed there without making compensation to it as the present owner, and because no compensation had been made to the state under whom said company claims title; and *second*, because that company was the owner of the banks along the Black Snake, and as such owner had the right to have the waters of Black river flow into its old channel as it was accustomed to do before the appellant company closed the mouth of the same, and, because no compensation had been made to it or its grantees by the plaintiff, it had the right to remove the obstructions placed by the plaintiff in the river to prevent such flow, whether such obstructions were on the defendant's land or not.

Upon the first point we are of the opinion that any embankment which was made by the plaintiff, under its charter, on lands then owned by the state, adjoining the Black river, in order to confine its waters, were lawfully made without making any compensation to the state. The charter granted by the state, giving the corporation the power to build and maintain levees and embankments along the shores of the Black river in order to improve the navigation of the same, by necessary implication, gave the corporation the right to use for that purpose any lands owned by the state which were located upon the shores of said river. And as to lands upon which such embankments were made while the title remained in the state, the purchaser thereof from the state by a subsequent conveyance would take the same subject to the right in the plaintiff to maintain such embankments upon such lands. In construing the act of incorporation, we are bound to take into consideration the situation of things at the time the grant was made,

as well as the purposes of the grant. At the time the charter was granted to the plaintiff, the lands along the river where it would be necessary to make embankments and levees were, to a great extent, owned by the state; and as there were no means provided by the charter by which the corporation could acquire the right to make such embankments or levees upon the state lands by making compensation to the state, while the charter contained provisions for acquiring the right from private owners, although such provisions may have been in sufficient to accomplish that purpose, it would seem to be a fair inference that the legislature intended to grant the right of such use to the corporation without compensation as to all lands owned by it which it would become necessary to use in executing the purposes of the grant.

It has been held by other courts, and such appears to be the settled construction, that when the legislature authorizes a public highway, or other public improvement of a like nature, by a corporation, the making of which will necessarily require the use or taking of the public lands, and no negative words are contained in the charter, and no provision made for making compensation to the state for public lands so required to be taken, the right to use or take the same for such purpose is conferred upon the corporation without making compensation therefor. This construction of the plaintiff's charter is very strongly supported by the following cases cited by the learned counsel for the appellant: *Ind. C. Railroad Co. v. State*, 3 Ind., 421; *Pa. Railroad Co. v. Railroad Co.*, 8 C. E. Green (Ch.), 157; *Davis v. E. T. & Ga. Railroad Co.*, 1 Sneed, 94; *United States v. Railroad Bridge Co.*, 6 McLean, 517. And while we are unwilling to commit ourselves to the full extent of the doctrine as laid down in the first case above cited, we are clearly of the opinion that the doctrine should be applied to this case to the extent of holding that, as to all lands owned by the state on the margin of the Black river at the time of making the improvements by the plaintiff, it had

the right to use such state lands as were necessary to make
levees and embankments to accomplish the purposes of the
charter, without making compensation therefor; and further,
that as to the state it had the right to close up any chutes or
side-cuts, for the purposes of such improvement, whether such
chutes or side-cuts were navigable or otherwise; and that if
the state had any riparian rights as owner of the lands on the
banks of such chutes or side-cuts, the corporation had the
right, without making compensation, to destroy such rights,
so far as the closing up of said chutes and side-cuts would
destroy them; and that all subsequent purchasers from the
state would take subject to such right of the plaintiff. As
having some weight in the determination of this question, we
may be permitted to take into consideration the general policy
of the state upon questions of a similar character. No case
can probably be found where any compensation was required
to be paid to the state for the opening of ordinary public
highways through lands owned by the state; and, in relation
to the construction of railroads, as early as 1857 the legisla-
ture passed an act giving a right of way, without compensa-
tion, through the university, school, swamp and overflowed
lands of the state, one hundred feet in width, to every railroad
thereafter constructed in this state. Chapter 9, Laws of 1857;
chapter 79, R. S. 1858; section 1270, R. S. 1878. We are
inclined to hold that the levees and embankments made by
the plaintiff along the margin of Black river upon lands
owned by the state at the time the same were made, were
lawfully made without making any compensation to the state
or to the subsequent purchasers from the state. The levee or
embankment made upon lot 7 was made with the consent of
the then owner, who held a contract from the state, and, so
far as the state retained the title, with its consent; and, the
purchaser having afterwards forfeited his right to the land,
and the state again becoming the absolute owner, its subse-
quent grantee must take the same subject to the right of the

plaintiff to maintain said levee or embankment. Under the decisions of this court, when the purchaser, McMillan, failed to pay the interest on his certificate of purchase of lot 7, the right of the state became as perfect as though no sale had ever been made, and the title of the state was the same as though no certificate had ever been issued. *Conklin v. Hawthorn*, 29 Wis., 476, 480; *Smith v. Mariner*, 5 Wis., 578. In this view of the case the defendants had no right to interfere with the levees or embankments of the plaintiffs on any lands which were owned by the state at the time the same were made.

The only other ground of justification of defendants' acts is based upon the other alleged fact, that, as owners of lands on the margin of the Black Snake river, they had a right to have the waters of said river flow past their lands as it was accustomed to do before the entrance of said river was obstructed by the plaintiff, unless compensation was first made to them for obstructing the flow in said river. As to those lands which the defendants purchased from the state on the margin of the Black Snake after the waters of said stream had been obstructed by the plaintiff, they were not entitled to any compensation for the obstruction of such flow. The state having authorized such obstruction, and having made no provision that the corporation should make the state any compensation on account thereof, none can be claimed by the state, nor by its grantees subsequent to the time when such obstructions were made.

The findings of fact do not show that the defendants, or any of them, are now, or were at the time of the acts complained of by the plaintiff, the owners of any lands on the shores of the Black Snake, the title to which was not in the state of Wisconsin at the time the obstructions were made which prevent the flow of the waters of the Black river into the same. And, after an examination of the record, we are unable to say with any certainty that they were or are now the owners of any lands on said Black Snake which were not owned by the state

at that time, except lot 8, in section 22, town 17, range 8 W. This lot 8 is a very small parcel of land at the point where, according to the government survey, the waters of the Black river were diverted into what is now called the Black Snake. This tract of land contains but a very few acres, and lies between the main river and the Black Snake, so that the owner thereof can have access to the waters of the main channel without passing up the Black Snake. But as we may be mistaken upon this question of fact, and the defendants may be the owners of lands on the banks of the Black Snake between the place where its waters leave the main channel and Rice lake, the title to which was not in the state at the time the obstructions were made by the plaintiff, it becomes necessary for us to inquire whether the ownership of such property by the defendants would justify them in removing the plaintiff's levee or embankment for the purpose of restoring the accustomed flow of water in the old channel of the Black Snake through or in front of the lands so owned by the defendants.

The learned circuit judge held that, unless the plaintiff had made compensation for any damage resulting to such riparian owners, its acts as to them were unlawful, and they were at liberty to right themselves by destroying so much of its works as might be necessary to restore the flow of the waters in the Black Snake as the same were accustomed to flow before the plaintiff's obstructions were put in the river. · Admitting such ownership on the part of the defendants, it is contended by the learned counsel for the plaintiff, that as such owners they have no such vested right to the waters flowing in said Black Snake as will prevent the state, or the plaintiff acting in behalf of the state, from diverting such waters from that channel, if it becomes necessary or convenient to do so in order to improve the navigation of the main channel of the river. It is claimed that the riparian owner on a navigable stream has no right as against the public, or persons or corporations acting in behalf of the public, making improvements of such

navigable stream, to have the waters of such stream flow in their accustomed course in front of his lands; and this contention on the part of the learned counsel for the appellant is, we think, sustained by the most learned courts of this country, and that doctrine has been quite clearly sanctioned by several decisions of this court. *Canal Appraisers v. The People*, 17 Wend., 571; *People v. Canal Appraisers*, 33 N. Y., 461, 500. These cases were thoroughly discussed by learned counsel, and the opinions delivered were learned and exhaustive of the subject, and in both cases it was held "that riparian owners along a navigable stream are not entitled to damages for any diversion or use of the waters by the state." In these cases the waters were not diverted in order to improve the navigation of the same stream, but to supply the Erie canal, an artificial water-course constructed by the state. *Lansing v. Smith,* 8 Cow., 146, and many other cases in that state, are to the same effect.

In *Hollister v. Union Co.*, 9 Conn., 436; it was held that as to navigable rivers the state, holding the river for that purpose, may do everything for the full enjoyment of such right not inconsistent with the great constitutional provision that "private property shall not be taken for public use without just compensation;" and that consequently the placing of piers and other obstructions in the river in good faith, by a company authorized by the state to improve the navigation of such river, by means of which the water within the banks of the river was raised and the current thereof changed opposite the plaintiff's land, by reason whereof his bank was undermined and washed away, did not give any cause of action against the company.

In *McKeen v. Delaware Division Canal Co.*, 49 Pa. St., 424, it is held that "every one who buys property upon a navigable stream purchases subject to the superior rights of the commonwealth to regulate and improve it for the benefit of all her citizens. If, therefore, he chooses to place his mills or

his works, for the qualified use he may make of the water, within the limits or influence of high water, he does so at his own risk, and cannot complain when the commonwealth, for the purpose of improvement, chooses to maintain the waters of the stream at a given height within its channel." The same doctrine of the right of the state to control the navigable waters of the state, without liability for damages, is held in the following cases in that state: *Monongahela Navigation Co. v. Coons,* 6 W. & S., 101; *Susquehanna Canal Co. v. Wright,* 9 W. & S., 9; *Monongahela Bridge Co. v. Kirk,* 46 Pa. St., 112; and many other decisions of the courts of that state hold the same doctrine.

In the case of *Fitchburg Railroad Co. v. Railroad Co.,* 3 Cush., 58–88, Chief Justice Shaw says: "It is incident to the power of the legislature to regulate a navigable stream so as best to promote the public convenience; and if, in doing so, some damage is done to riparian proprietors, and some increased expense thrown upon them, it is *damnum absque injuria.*" See also *Rundle v. Delaware & Raritan Canal Co.,* 14 How. (U. S.), 80; *Willson v. Black Bird Creek Marsh Co.,* 2 Pet., 250; *Transportation Co. v. Chicago,* 9 Otto (U. S.), 635; *Pumpelly v. Green Bay Co.,* 13 Wall., 166, 181; *Fay v. Aqueduct Co.,* 111 Mass., 27; *Com'rs Homochitto River v. Withers,* 29 Miss., 21; *Treat v. Lord,* 42 Me., 552. These cases and many others hold the doctrine that the waters in a navigable river, or other navigable body of water, are so far the property of the state that the state may control them for public purposes, in their flow or otherwise, without making any compensation to the riparian owners upon the borders of such streams or bodies of water. The flowing waters in such streams are public highways, and such water-ways are as much subject to the control of the state for the purposes of the improvement of such ways, as a highway upon the land. The right of the public to raise or lower the grading of a public street without being required to compensate the ad-

jacent owners is well established by the decisions of this court (*Dore v. City of Milwaukee*, 42 Wis., 108; *Harrison v. Bd. of Sup'rs of Milwaukee Co.*, 51 Wis., 645); and the right to discontinue a highway without making compensation has always been recognized by the law. The right of the riparian owner to have the water of a navigable stream flow past his lands adjoining the same as they were accustomed to flow, is as perfect against everybody except the state, or some person or corporation standing in its stead, as it is in the case of unnavigable streams; and that right does not, as this court has decided, depend upon his ownership of the soil under the water, but upon his riparian ownership (*Cohn v. Wausau Boom Co.*, 47 Wis., 314, 322); and the right of the state to control the waters of such streams in the public interest is the same whether the ownership of the soil under the water be in the state or in the riparian owner.

The doctrine of the cases above cited has, as we think, been fully adopted by this court in all cases where the interference with the waters of a navigable stream has been for the improvement of the navigation thereof. Whether this court has decided or will decide that the state may, for any and all public purposes, interfere with the waters of a navigable stream, whereby injury may result to the riparian owner, without making compensation therefor, need not be determined in this case. The plaintiff represents the state for the purpose of improving the navigation of the Black river, and that which it has done under its charter, which is complained of by the defendants, we think must be, for the purposes of this action, considered to have been done for the improvement of navigation in said river. And, as against the state, or the plaintiff acting in its stead, we think this court has determined that the riparian owners on the banks of the Black river, or the Black Snake river, have not the absolute right to have the waters of said river flow as they were accustomed to flow in front of or through their lands. See *Wisconsin River Imp. Co.*

*v. Lyons,* 30 Wis., 61–65; *Cohn v. Wausau Boom Co., supra;
Stevens Point Boom Co. v. Reilly,* 46 Wis., 237. In the cases
last cited, the rights of a riparian owner upon a navigable
stream, and the power of the state to restrict, limit or take
away such rights, were fully discussed; and this court, after
mature deliberation, came to the conclusion that these rights
are the subject of legislative control without making compen-
sation, where they are taken for the purpose of improving the
navigation of such stream.

In the case of *Cohn v. Wausau Boom Co., supra,* the
plaintiff brought an action to enjoin the defendant company
from completing its works as authorized by its charter, upon
the ground that he was a riparian owner of land upon such
river, which he had bought for the purpose of building thereon
a saw-mill; that in the natural flow of the water in front of
his lands he could, by the use of booms and other appliances,
stop the logs coming down said river and hold them for the
purpose of being manufactured in his mill; that he was the
owner of large tracts of pine land above said point, and that
by reason of the structure already completed, and others which
the defendants threatened to construct in the river and in front
of his land, the channel of the river had been shifted from its
natural place, the current in front thereof greatly increased,
and the water made to flow with great velocity, so as to form
the main channel of the river; and that by reason thereof the
approach to the plaintiff's land had been rendered inaccessible
for logs and lumber, all connection with the center of the
stream cut off, and the fitness of the land for booming and
mill purposes destroyed.

In the opinion delivered in that case by the late Chief Jus-
tice RYAN, he says: "The appellant must therefore be held to
be a *quasi* public corporation, an agent of the state for the im-
provement of the river, and its franchises granted for a public
use. Of course, private property of others could not be in
any way appropriated or used by the appellant in aid of the

public purpose without authority of law, upon just compensation. But the land, of the respondent is neither taken nor used; the works of the appellant, neither touch it nor overflow it. The statutes under which the appellant acts authorize no such interference with the property of others. They only aid the public use for which the appellant is chartered, by restraining the exercise of a private right which the legislature appears to have considered inconsistent with it; a right which the respondent, as other riparian owners, held only by implied public license — as it were, as tenant by sufferance of the state; a right of which the exercise might always be prohibited by public law in aid of public use. The private right is a *quasi* intrusion upon the public right, tolerated only in private aid of navigation, and gives way *ex necessitate rei* to public measures in aid of navigation." The learned chief justice then quotes the following language from his opinion delivered in the case of *Stevens Point Boom Co. v. Reilly*, 46 Wis., 237: "'This private right of the riparian owner is subordinate to the public use of a navigable river, and is always exercised at peril of obstructing navigation. This subjection of the private right to the public use may sometimes impair the private right or defeat it altogether. But the public right must always prevail over the private exercise of the private right.' As against the riparian owners, within the limits specified in the statute, the state has only resumed its own. Otherwise, the title, possession and use of the respondent's land remain intact. If the public action lessen its value, it is literally *damnum absque injuria*."

It will be seen, from a consideration of all the facts in that case, that this court also held that, under authority from the state for the purpose of aiding navigation, the corporation had the right to keep and maintain in the river opposite to the riparian owner's land, and between the thread of the stream and the land of such owner, permanent fixtures driven into or resting upon the soil under the navigable waters of the river,

without making any compensation therefor. These opinions of this court seem to have adopted the doctrine of the cases above cited from the courts of other states and of the United States as to the power of the state to control the waters of all navigable rivers or other waters of the state, whenever such control is exercised in the interest of navigation. The action of the legislature upon this question of closing sloughs would seem to indicate that such was also the view of the case taken by that department of the government; for in chapter 399, Laws of 1876, in defining the powers of improvement companies, and authorizing them to close up sloughs, among other things, in aid of navigation, it is expressly provided that no such company shall close any sloughs unless they own the entire shore on both sides thereof, or have the written consent of the owners thereof; and this same provision is reënacted in section 1777, R. S. 1878. It would seem that the legislature must have supposed they had the power to grant the right to close such sloughs without the consent of the owners of the shores; otherwise it would have been unnecessary to declare that it should not be done except with their consent.

The view entertained by this court in the cases above cited and in this case are not in conflict with the cases of *Pumpelly v. Green Bay Co.*, 13 Wall., 166, and *Arimond v. Canal Co.*, 31 Wis., 316. In those cases the question was not as to the power of the state to interfere with or control the waters of navigable streams within their channels, but whether it had the right to force such waters out of their channels and flood the lands of the citizen without compensation. The distinction between these cases and cases like *Cohn v. Wausau Boom Co., supra*, and the case at bar, are commented upon by the courts in the opinions delivered therein.

The case of *Delaplaine v. Railway Co.*, 42 Wis., 230, differs from the case at bar and *Cohn v. Wausau Boom Co.* in the fact that the obstruction placed in the navigable waters in that

case in front of the plaintiff's land was not placed there in aid of navigation or for the improvement of the navigation, but for an entirely different purpose; and the doctrine laid down in that case must be restricted in its application to cases resting upon the same class of facts, and cannot be extended to a case where the state places obstructions in the navigable waters of the state for the purpose of improving the navigability of the stream. If it be thought that the powers granted to the plaintiff corporation in this case were improvidently granted, and that some limit should have been placed on its right to close up navigable waters or interfere with the riparian rights of owners on the navigable waters so closed up, the legislature is the tribunal to which application should be made to remedy such evil; and so, if the corporation has so made its improvements that they are inadequate to furnish the facilities to navigation on the river which the increased business on the same demands, the legislature is competent to give the proper relief in that direction. If the corporation has, by the way in which its improvements have been made and are maintained, acted unreasonably or unnecessarily, so as to obstruct navigation instead of improving it, the remedy should be by a proper action to forfeit the franchises of the corporation; or, if the defendants have suffered any injury from the obstruction to navigation, they have a remedy by an action at law; but they ought not to be permitted to abate without action the works of the plaintiff as a private nuisance.

We see no reason why the defendants may not, for their own purposes, maintain sorting and rafting works in the Black river opposite to their lands so that they do not interfere in any way with the works of the plaintiff; or why they may not excavate in front of their lands in Rice lake for the purpose of aiding in rafting logs, or for any other lawful purpose, if they do not interfere with the works of the plaintiff; and except as to these matters we are of the opinion that the court should

Sabotta vs. The St. Paul Fire & Marine Ins. Co.

have granted the relief demanded by the plaintiff in the complaint.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to that court to render judgment in accordance with this opinion.

A motion for a rehearing was denied May 10, 1882.