Argued February 6, affirmed in part; modified in part;
reversed in part March 12, petition for rehearing
denied April 29, 1969

## SCOTT, *Respondent, v.* ELLIOTT, *Appellant.*

451 P2d 474

*Larry O. Gildea,* Eugene, argued the cause for appellant. On the briefs were Gordon K. Wylie, and Wylie, Gildea & Speer, Eugene.

*Edward N. Fadeley,* Eugene, argued the cause and filed the brief for respondent.

Before PERRY, Chief Justice, and McALLISTER, GOODWIN, HOLMAN and HAMMOND, Justices,

HAMMOND, J. (Pro Tempore).

Plaintiff brought this suit to enjoin defendant from interfering with his peaceful enjoyment of a tract of land 1040.16 feet long and 33 feet wide, and to bar defendant from asserting any right or title to the property. The complaint contends that defendant placed large quantities of junk, odd machinery, poles and

debris on the land, changed the bed of a watercourse which ran through the property, moved quantities of dirt from plaintiff's land to that of defendant, and caused an electrical power line to be placed on the land so that it traversed the length of it. Plaintiff asks that the offending material be removed from the property, that the earth which had been removed be returned, that the defendant be required to place the watercourse back in its natural state and that he have compensatory damages for the alleged trespass and encroachment plus punitive damages based upon a claim that defendant's conduct was malicious.

After denying the allegations of the complaint, defendant asserts that he is the owner of the land described in the complaint, plus a strip of land adjacent thereto on the east having the same length and being 20 feet wide on its north end and 2½ feet wide on its south end, making in all a strip claimed by the defendant with a west line 1040.16 feet long, a north line of 53 feet, a south line 35.5 feet long and an east line that completed the enclosure. Defendant claims title to the premises by adverse possession and prays that title thereto be confirmed in him. The reply denies defendant's claim.

Upon trial of the matter, the court issued its decree as follows:

"IT IS HEREBY ORDERED ADJUDGED and DECREED:

"1. That Plaintiff have judgment against Defendant in the sum of Two Thousand Five Hundred Dollars ($2,500.00) and for his costs and disbursements herein to be taxed;

"2. That Defendant is hereby restrained and enjoined from molesting and interferring [sic] with Plaintiff in the peaceable occupation and enjoyment

of the following described premises and Defendant is hereby barred, as are all persons claiming by, through or under him, from asserting any right, title, interest or possession in and to the following described premises, to-wit:

"Beginning at a point in the center of County Road No. 540 (Irvington Drive) 2051.48 feet West of the Southeast corner of the Marion Scott Donation Land Claim No. 56, in Township 17 South, Range 4 West of the Willamette Meridian, thence North 0° 14' 30" East parallel with the East line of said Scott Claim 1040.16 feet; thence West parallel with the south line of said Scott Claim 33.0 feet; thence South 0° 14' 30" West parallel with the East line of said claim 1040.16 feet to the South line of said Scott claim; thence East 33.0 feet to the point of beginning, in Lane County, Oregon.

"All title and rights to said premises are hereby settled and quieted in Plaintiffs. [sic]

"3. That Defendant is hereby restrained from allowing any property of his own, in the form of junk, old inoperative machinery, and trash in the form of old wooden poles and other debris, to remain on the above described premises and Defendant is required to forthwith cease the trespass created by his aforesaid personal property being upon the real property of Plaintiff by removing his property therefrom.

"4. That Defendant forthwith make restitution of Plaintiff's land and premises: By returning as near as may be, that soil which Defendant has converted to his own use and benefit; by placing the watercourse back in its natural state; and by removing the electric power poles from Plaintiff's land."

The properties in question each have a south line that is the center of Irvington Drive. The most westerly property is the farm of the defendant. Next on the east is the 33-foot strip described in the complaint

(and hereafter referred to as Parcel A), adjoining which is the strip having a width of 2½ to 20 feet (hereafter referred to as Parcel B), which (together with the 33-foot strip) defendant claims by adverse possession, Parcel B being the most westerly portion of property acquired by plaintiff in May 1966 from Andersons.

Defendant's farm was acquired by his father in 1941 and owned by his father until his death in 1959. Defendant's ownership of the farm was obtained in part by inheritance from his father, and by deed to defendant in 1961 from his brother and his sister.

Parcel A was purchased in 1927 by Lawrence and Louise Szukai as a part of and as a 33-foot access to a 94-acre tract lying north of plaintiff's land, which tract is still the Szukai farm. Mr. Szukai died in 1965 and his wife continues to farm the land. Parcel A ceased to be the principal access to the Szukai farm when they purchased an additional access strip in another location. Parcel A was conveyed by Mrs. Szukai to plaintiff in April 1966.

The east line of Parcel B is represented on the ground by the remains of an old fence that, according to the testimony, has existed in its present location from a date prior to 1941. Defendant contends that he and his predecessors were in possession of all of the property to such fence for more than ten years prior to the commencement of the suit. The record is silent regarding who erected the fence.

During the ownership of defendant's farm by his father, the senior Elliott had people living on the farm who operated it for him. The farm buildings were located in the southeast portion of the farm, and near Parcel A. For at least part of that period there were two cross fences that extended easterly from the barns

through Parcel A to the fence that is the east line of Parcel B. There were gates in the fences that permitted equipment to be moved along a lane which ran on the east edge of defendant's farm for the full length of Parcel A. Neither of the fences was more than 500 feet north of Irvington Drive. 'Two of the tenants of the defendant's father testified that while they were on the farm cattle were permitted to graze from the Elliott farm onto the southerly parts of Parcels A and B and to drink from Flat Creek, which meandered across the Szukai farm and neighboring lands, then across Parcels A and B at a point just north of the Elliott buildings, then following generally down Parcel A, except for a distinct bow in the stream bed where it went onto the Elliott property between their two barns. The creek flows under Irvington Drive at the south end of Parcel A.

Mr. Bottom, who operated the Elliott farm from April 1942 until September 1950, testified concerning his understanding of the ownership of Parcel A as follows:

"Q (By Mr. Gildea) During the time that you lived there and during the time that you worked with Mr. Elliott in charge of his ranch, did he ever say anything to you which would give you reason to believe that he did not own that land?

"A  Yes.

"Q  What?

"A  Well, I don't know as I can just tell you the words he said, but nearly what it meant. That strip belonged to Mr. Szukai, that was my understanding, that that little strip of land there, that lane taken up through there belonged to Mr. Szukai.

"Q  And he was using it anyway?

"A  Pardon?

"Q You were using it even though it belonged to Mr. Szukai?

"A Yeah."

Defendant also testified that his father's cattle ran onto the area between the Elliott farm and the east line of parcel B while his father was alive, and that he bought the cattle and ran them on the same tract until 1963 when he got rid of the cattle. The essence of the testimony of the defendant and of his father's tenants was simply that the cattle were there without objection for the period indicated. No other member of the Elliott family appeared as a witness.

Mrs. Szukai testified that her husband and the defendant's father were friends and had many transactions together. There was not a roadway through the Szukai 33-foot strip that is Parcel A, but the senior Elliott had a lane on his property alongside such strip, which lane ran to the southwest corner of the Szukai farm and it was more convenient to haul grain from their farm out the Eliott lane than to go across the farm and out the 15-foot access road they normally traveled. Mrs. Szukai described conversations between her husband and the elder Elliott wherein they agreed that Elliott could use the Szukai 33-foot strip and the creek therein to water his cattle in exchange for which the Szukais could haul their grain out over the Elliott lane. She stated that the parties operated under such agreement until the death of defendant's father in 1959.

In the spring of 1966, and before she sold Parcel A to plaintiff, Mrs. Szukai's testimony is that she had a conversation with defendant about her ownership of such parcel at the time he was discussing with her the

placing of power poles to his back fields, the testimony being:

"A  Yes, I said, 'Remember I own 33 feet,' and he said, 'Yes,' he said, 'I know you do.'

"Q  Do you know about what time of year in 1966 that would be?

"A  Well, it was in the spring, I can't tell you just what time, no.

"Q  It was before you sold to Mr. Scott?

"A  It was before I sold to Mr. Scott, yes.

"Q  Has Mr. Elliott claimed to you or to your husband in your presence that he owned a 33 foot strip or any portion of this strip from Irvington Drive on north to your—

"A  No, he knew we owned that."

Mrs. Szukai further testified that defendant had placed junk on their 33-foot strip and that defendant and Mr. Szukai had a conversation about it.  She related the following:

"Q  (By Mr. Fadeley)  All right, was Mr. Elliott in your home after the complaint with the junk on the property?

"A  Mr. Elliott was at our home when my husband asked him to remove the property and it was on July the 29th of '64 that he was at our house.

"Q  You were present?

"A  Yes.

"Q  What did your husband say?

"A  He asked him to remove the junk that was on our property, that he didn't want him to keep it there.

"Q  What did Mr. Elliott say?

"A  Well, he said he was awfully busy now but he would.  But he never has."

Taxes on Parcel A were always paid by the Szukais. Neither the defendant nor his father ever claimed own-

ership of the disputed strip until after the commencement of this litigation.

The sole reference in the transcript to any statement by the defendant or his father in this regard was the testimony of an engineering technician for the Eugene Water and Electric Board who laid out the location for power poles that were erected along the west line of Parcel A. He stated that in the spring of 1966 defendant placed a stake for the location of the first pole "and made the statement that this is approximately the property line, the rest is in question, but this is where he would like to have it."

Defendant never kept up the fence after he disposed of the cattle. Mr. Marko, a surveyor, testified about the fence as follows:

"Q Was this fence a complete fence that you show on the Exhibit A?

"A I couldn't call it a complete fence, no, it was —it was a neglected type of fence.

"Q Were there places where you could go through without—

"A Yes, there were.

"Q The fence was down?

"A And there was places where you couldn't see where the fence was, couldn't locate it.

"Q When was this?

"A I believe March, 1966."

Other than the running of cattle on the disputed property the only acts of the defendant or his predecessor evidencing possession were those committed by the defendant subsequent to May 1962 when he moved onto the farm. These acts are discussed later herein, but they form no basis for a successful claim of title in the defendant by adverse possession for reasons hereinafter set forth.

■ In order to establish title by adverse possession it is necessary to establish by clear and positive proof that there has been an actual, open, notorious, exclusive, continuous and hostile possession of the premises for the full statutory period of ten years (ORS 12.050) under claim of right or color of title. *Fry et al v. Woodward et ux,* 221 Or 39, 350 P2d 183 (1960); *Reeves et al v. Porta,* 173 Or 147, 144 P2d 493 (1944); *Laurance et al v. Tucker,* 160 Or 474, 85 P2d 374 (1939).

■ The great weight of the evidence is that defendant's father, at the most, only used the southerly 500 feet of Parcels A and B, and that such use as he did make was by permission of the Szukais, whose ownership of Parcel A was never in dispute, under an arrangement whereby the senior Elliott was a tenant at will of the owners of the fee. Permissive use, no matter how long continued, is not adverse, and when proved, denies the adverse possession. *Lamford Lbr. Co. v. Lemons et al,* 206 Or 140, 289 P2d 684, 291 P2d 733 (1955); *Laurance et al v. Tucker,* supra; *Coquille Mill & Mercantile Co. v. Johnson,* 52 Or 547, 98 P 132 (1908).

■ The permissive use intended by the agreement between the senior Elliott and the Szukais was that Elliott could use, upon the terms specified, the land owned by Szukais and lying adjacent to the Elliott farm. The fact that such use may have spread to a portion of Parcel B, due to the existence of a fence that inaccurately portrayed the east boundary of the Szukai property, does not alter the permissive character of the use by Elliott of all of the property in dispute.

■ Defendant cannot make out the required ten-

year period necessary to perfect title by adverse possession by tacking to his years of possession of either Parcel A or B any part of his father's use thereof for the reason, as above stated, that his father's occupancy was permissive and therefore not adverse. *Du Val et ux v. Miller,* 208 Or 176, 300 P2d 416 (1956). This suit was commenced in November 1966. The defendant was not, in any capacity, in possession of any of the subject property for ten years prior to that date.

We hold, therefore, that defendant has failed to establish ownership of either Parcel A or Parcel B by adverse possession, and that the portion of the decree which settles and quiets the title to Parcel A in the plaintiff and which enjoins defendant from interfering therewith should be affirmed.

■ Over the period from 1962 to 1966 defendant has placed upon Parcel A a large quantity of old vehicles, inoperative machinery, junk, poles and trash. Defendant was asked by Mr. Szukai, and later by plaintiff, to remove this personal property, but has failed to do so. That part of the decree which requires its removal will be affirmed.

■ In the spring of 1966 defendant arranged for the construction of an electric power line from Irvington Drive to fields in the north portion of his farm. For this purpose he gave to the Eugene Water and Electric Board a perpetual easement to erect and maintain such a line within a strip of land ten feet wide that is within defendant's property, the first 1040.16 feet of which immediately adjoins Parcel A. As a guide to the location of the line the defendant placed stakes indicating where his property line was and the electric company placed its poles one foot west of such stakes. A survey of the land indicates that the power poles were actually erected by the Eugene Water and Elec-

triċ Board within Parcel A and range from 1.4 feet to 8.2 feet inside the west line of such parcel. The encroachment of the power poles upon plaintiff's land was not the act of the defendant (although he appears to have led the electric company into error), and the poles and equipment thereon are not the property of defendant. It therefore follows that the portion of the decree which requires defendant to remove the electric power poles from plaintiff's land must be reversed.

During 1965 and before plaintiff purchased Parcel A from Mr. Szukai the defendant went on Parcel A with a bulldozer and altered the course of Flat Creek by digging out, deepening and straightening the channel so that after entering Parcel A about 500 feet north of Irvington Drive the stream now stays completely within Parcel A as it flows south to a culvert under Irvington Drive and no longer has a bow to the west onto defendant's land. In so doing, the defendant excavated dirt out of Parcel A and placed it in an area on his land where he has a lane going to his back fields, thereby raising the level of the lane above its previous marshy surface. After plaintiff purchased the land in controversy, defendant did some more bulldozing work in the ditch channel, which work he described as simply evening up the ditch and taking out a hump in it. Plaintiff saw defendant's doing the last operation and sent a police officer out to tell defendant to stop the work, which defendant then did.

■ The major portion of the bulldozing of the creek channel and all of the removal of dirt from Parcel A to defendant's land was done while such parcel was owned by Mrs. Szukai. The record does not disclose any substantial alteration in the stream bed or the soil on Parcel A after plaintiff became the owner thereof. The right of action for permanent injuries to land be-

longs to the party who owns the land at the time the injuries occur. *Powell v. Superior Portland Cement, Inc.*, 15 Wash2d 14, 129 P2d 536 (1942); 92 CJS 208, Vendor and Purchaser § 318.

■ Where the alteration of a stream is of a permanent nature, and one which, as in this case, the then owner of the land may authorize, the injury is regarded as complete as of the time of the creation of the particular condition, so that a subsequent grantee cannot maintain an action therefor. *Irvine v. City*, 170 Iowa 653, 150 NW 674 (1915); *The Black River Imp. Co. v. The La Crosse Booming and Trans. Co. et al*, 54 Wis 659, 11 NW 443 (1882); 56 Am Jur 530, Waters § 46.

■ Plaintiff had knowledge of the damage done to the land at the time he purchased the property from Mrs. Szukai and will not now be allowed to recover for such damage or have the land restored to its previous condition since he is presumed to have obtained the benefit of reduced value of the property. *Thomas v. Louisville & N.R. Co.*, 264 Ky 457, 94 SW2d 996 (1936).

That part of the decree is reversed which requires defendant to:

> "* * * make restitution of Plaintiff's land and premises: By returning as near as may be, that soil which Defendant has converted to his own use and benefit; by placing the watercourse back in its natural state * * *."

Damages, incidental to the equitable relief prayed for, were alleged to be the sum of $1,000 as loss of rents and profits of the land due to defendant's storage of machinery and debris on the property from May 20, 1966; $300 plus $75 per month as damages for the existence of the power poles on the property, together

with a claim for $7,500 by way of punitive or exemplary damages.

There can be no allowance of damages for the existence of the power poles for reasons above described.

■ This is not a case for punitive or exemplary damages.

■ The measure of damages for the temporary loss of the use of the property is the fair rental value of the property. McCormick, Damages 167, § 44 (1935). The only evidence of fair rental value was that adjoining property was being rented for $50 per acre per year. The damages, then, for plaintiff's loss of use of the 4/5 of an acre in question for the period of time referred to is $66.75. The allowance of damages will be limited to such sum. Plaintiff to recover his costs and disbursements.

Affirmed in part; modified in part; reversed in part.