416 P.2d 425

PHOENIX TITLE AND TRUST COMPA-
NY, a corporation, Marvin Lustiger and
Thelma Lustiger, his wife, Henry Stein-
berg, Lake Mead Land and Water Co., a
corporation, Appellants,

v.

J. M. SMITH and Winnie E. Smith, his wife,
Dale D. Smith and Barbara M. Smith,
his wife, Appellees.

No. 7705–PR.

Supreme Court of Arizona.

In Banc.

June 30, 1966.

Rehearing Denied Sept. 20, 1966.

Lewis, Roca, Scoville, Beauchamp & Linton, John P. Frank, Walter Cheifetz, Phoenix, for appellants.

Hughes & Hughes, John C. Hughes, Hess Seaman, Renz L. Jennings, Phoenix, for appellees.

McFARLAND, Justice.

Pursuant to Rule 47(b), Rules of the Supreme Court, 17 A.R.S., and A.R.S. § 12–120.24, we granted a petition to review the decision of the Court of Appeals reported in 1 Ariz.App. 424, 403 P.2d 828, which reversed a decision of the trial court in which the defendants, appellees, J. M. Smith and Winnie E. Smith, husband and wife, and Dale D. Smith and Barbara M. Smith, husband and wife, hereinafter referred to as the Smiths, recovered judg-

ment against the plaintiffs, appellants herein, Phoenix Title and Trust Company, a corporation; Marvin Lustiger and Thelma Lustiger, husband and wife; Henry Steinberg; Lake Mead Land and Water Co., a corporation, who brought suit to quiet title to some 40,000 acres of land in Mohave County, Arizona.

The questions presented call for an interpretation of the provisions of an agreement of sale and escrow instructions and accompanying deed which provided for reservation of "range-use rights" by the defendant-sellers.

In the trial there was submitted to the jury an interrogatory which was answered by the jury in favor of the defendants.[1] The court, in an opinion, set forth the historical background and facts in regard to the land development in Mohave County.[2] The material facts set forth in the opinion, based on the record and on matters of which the court could take judicial knowledge, were incorporated in the findings of facts by the court which adopted the findings of the jury in answer to the interrogatory and which, together with conclusions of law, formed the basis for the judgment of the court.

The history and background of the range and land title situation in northern Arizona give a better understanding of the transaction in the instant case.

The building of railroads linking California and other territories with the eastern part of the United States was necessary in the development of the west. The railroad builders sought a grant from the Congress of the United States for right-of-way for railroad tracks, station grounds, etc., over the federal lands. They also sought from Congress, to assist them

1. The question presented to the jury:
   "Under the evidence, was the use of the words 'range use rights' by the defendants when they sold the land in question to Southwestern Realty Company sufficiently definite and certain to inform subsequent purchasers thereof that they could not fence, improve or occupy such lands, but were merely given the right to exchange them for lands owned by the United States Government?
   (Write an Answer 'Yes' or 'No.')
   Answer—Yes."

2. The late Charles Elmer, in his opinion and order for judgment, set forth ably the historical background of land development in the west.

in this promotion, a gift-in-aid of the construction which resulted in the Acts of 1860 which provided for land grants and grants for railroad rights-of-way. The Atlantic and Pacific Railroad Company, a predecessor of A. T. & S. F. Ry. Co., was granted the ownership in Arizona of each and every odd numbered section of federal lands within forty miles of the center of the line of the railroad, provided they were non-mineral in character and had not been previously sold or occupied.

In Mohave County, for many years known primarily as a mining and livestock producing area, the ranches were composed of lands in various categories of ownership. A stockman might own a homestead of 160 acres, or an enlarged homestead of 320 acres—or even a grazing homestead of 640 acres. He would then lease school and other lands included in his range which was owned by the state, mostly Sections 2, 16, 32 and 36 in each township and then the odd sections from the railroad which it had acquired in the railroad grant. The remainder of his range would then consist of lands still owned by the federal government, generally referred to as the public domain.

Conflict arose among the stockmen. Lands were over-grazed and this resulted in the adoption by Congress of what is known as the Taylor Grazing Act. Under the Taylor Grazing Act the "open range" disappeared. Each stockman was granted allotments of federal land which was based on factors including priority of use, ownership or control of base properties such a springs, watering places, and other improvements necessary for stock ranches, all of which were well known at the time of the transaction in the instant case.

J. M. Smith, commonly referred to as Jim Smith, a long-time Arizona cattleman, leased 45,000 acres, known as the Diamond Bar Ranch, a major portion of which is the subject of the instant suit, from Harry Handlery in 1951. The Smiths entered into a contract to buy the ranch in 1956 from Handlery Hotels, Inc., which

held title at that time. The agreement for sale, dated August 1, 1956, was not signed until October 3, 1956. Prior to the October 3, 1956 date, one George L. Dobson, hereinafter referred to as Dobson, a California real estate speculator, entered into negotiations with the Southwestern Realty Company, an Arizona corporation, for the purchase of a large parcel of land to be used for exchange purposes under U.S.C.A. § 315g of the Taylor Grazing Act of 1934. Under this provision, the holder of land may apply to the United States government to trade or exchange land for other land located elsewhere in the state. It is common knowledge that many land exchanges have been effected in Arizona under this provision. Privately owned lands, such as that included in the Diamond Bar Ranch, were exchanged for government lands. If the stockman still controlled the base property on which his grazing allotment was predicated, he would secure the grazing allotment on the lands which were exchanged as part of his range. In this manner he would continue to enjoy the use thereof substantially as he had theretofore, except that he would be paying grazing fees to the federal government rather than real property taxes to the county and the state. In addition, he acquired the ownership of the federal lands for which the exchange was made.

Considerable areas of land in Maricopa County and central Arizona remained in ownership of the federal government, and with the transformation of Arizona into an industrial state after World War II, this exchange of land, or lands, particularly in Maricopa County, became a very profitable business which, as stated in the lower court's opinion, lead to "speculation and development, ultimately leading to some abuses which evidently resulted in a refusal of the Federal Government to approve some of the exchanges offered."

O. C. Williams, a long-time friend of Jim Smith, acting for Southwestern Realty Company, entered into an agreement with the Smiths to purchase 40,000 of the 45,-

000 acres comprising the Diamond Bar Ranch. The evidence is abundantly clear that the Smiths entered into this agreement with the expectation of being able to graze their cattle on this land after transfer of the property. This was to be effectuated by a sale of only the "exchange rights"; i. e., the sale of only the right to exchange the 40,000 acres of land of the Diamond Bar Ranch in Mohave County for governent-owned land located elsewhere in Arizona. The Smiths did not include as part of the sale some 5,000 acres of the Diamond Bar Ranch on which were located waterholes, ranch buildings, etc., the base properties necessary to secure the grazing rights. The Taylor Grazing Act permits a stockman who controls the base properties of a range to secure the grazing allotment on federal land included in such range. The Smiths, having retained their base properties, would have been able, by such a transaction, to secure the grazing allotments on the 40,000 acres as part of their range. Thus, the Smiths could continue to graze cattle on the range of the Diamond Bar Ranch as they had done prior to the sale; otherwise the 40,000 acres of patented lands which were originally railroad grant lands, being the odd numbered sections which checkerboarded the Diamond Bar Ranch, if fenced and put to other use, would seriously damage the remainder of the ranch for grazing purposes.

The agreement between defendants and Williams was dated October 3, 1956. By agreement dated the same day, Williams sold this property to Dobson. This double transaction was entered into with the full knowledge of the Smiths, but Dobson did not learn that Southwestern Realty Company was other than a mere broker for the transaction until after negotiations were well under way. No specific mention was made in any of the agreements, escrow instructions, or deeds in either of the two transactions that the sale was to be of "exchange rights" only. The exchange was attempted for some three years, but the parties were unsuccessful.

Dobson then transferred his interest in the 40,000 acres to others, some of whom comprise the plaintiffs herein. Both the lower court and the Court of Appeals concluded that defendants, Williams and Dobson, intended the transaction to be a sale of "exchange rights" only. We are in accord with this finding. The question thus remaining is whether the agreements and deeds embodied this intent sufficiently to put subsequent purchasers on notice. The agreement for sale between defendants and Williams contained the following:

> "The sellers herein reserve unto themselves, their heirs, executors, and assigns, all range use rights."

The warranty deed for the land which was the subject of the sale contained the following:

> "The grantors herein reserve unto themselves, their heirs, executors, and assigns, all range use rights."

In accordance with the agreement and understanding between the Smiths and O. C. Williams, acting for Southwestern Realty Company, and Dobson and Williams, that the transaction was for "exchange rights only", Dobson continued negotiations for making exchanges of the land for other government-owned lands in the state. He first encountered difficulty, however, because of the reservation by the Smiths of "range-use rights." He therefore addressed a letter to the Phoenix Title and Trust Company, which letter resulted in the Smiths making a release of all their "range-use rights" insofar as they might affect the United States government upon acquisition of said lands by the government on an exchange. The release provided:

> "That we, J. M. Smith and Winnie E. Smith, his wife, and Dale D. Smith and Barbara M. Smith, his wife, sellers in that certain escrow numbered 541882, Phoenix Title and Trust Company and agreement dated 10/3/56 to Southwestern Realty, buyers of certain lands situated in Mohave County, Arizona, more

particularly described in said agreement recorded in Docket 17, pages 109–114, records of said Mohave County, having reserved unto themselves, their heirs, executors and assigns all described lands as against the United States Government."

It was then stated that the release was given for the purpose of facilitating an exchange and to guarantee to the United States government that all reservations were fully released. This release was filed and recorded at the request of the plaintiff, Phoenix Title and Trust Company, on January 22, 1959; however Dobson never completed the exchange. The record does not show the reason why the exchange was again denied by the Bureau of Land Management.

In a letter dated January 17, 1959, O. C. Williams wrote Dobson stating that the Smiths wanted to know if he wanted his money back; also, that he felt the deal was better than ever as the price of land was going up, and stating that if he wished out to please give him the first chance to raise the money.

The Southwestern Realty Company thereafter on the 23rd day of September, 1959, entered into escrow instructions with Phoenix Title and Trust Company, acting as trustee, and Dobson, which permitted the sale and conveyance of these lands to others, but subject still to the reservation of the "range use rights" to the defendants.

After making findings of fact and conclusions of law, the court entered the following judgment:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

1. That the use of the words, 'range-use-rights,' by the defendants when they sold the lands hereinafter set out to Southwestern Realty Company and caused to be recorded the original contract and the deed in the Office of the County Recorder of Mohave County, State of Arizona, was sufficiently definite and certain to inform subsequent purchasers thereof that they could not fence, improve or occupy such lands, but were merely given the right to exchange them for lands owned by the United States Government.

"2. That the plaintiffs are the owners of the portions of real property as hereinafter set out: (The names of the plaintiffs and description of the property are set out)

"3. That the reservation of range-use-rights by the defendants is valid and the defendants are entitled thereunder to the full and exclusive use of the lands for grazing purposes.

"4. That the plaintiffs and counter-defendants are barred and forever estopped from having or claiming any right or title to the above-described premises adverse to the reservation of the defendants and counterclaimants in and to all range-use-rights, * * *."

In Assignment 1 the plaintiffs assign as error Paragraph 1 of the judgment and the court's findings of 7, 8 and 9, and conclusions of law 3 and 4, contending that the reservation of "all range-use rights" does not give the purchaser of real property merely the right to exchange lands for lands owned by the United States government and does not bar such purchasers from fencing, improving, or occupying such lands as adjudged in Paragraph 1 of the judgment. Under Assignment 2, the plaintiffs contend that the court erred in Paragraphs 2, 3 and 4 of the judgment in holding that the property is subject to "range-use rights" and that the plaintiffs are estopped from having or claiming any right or title to the premises adverse to the reservation of the defendants of all "range-use rights. "Findings 7, 8 and 9 set forth the purchase agreements, stating that the parties were aware that Williams was not buying the land for himself, but intended to resell it and that Williams contracted for the 40,000 acres for that one purpose. The findings of fact by the trial court as to Williams stated it was: "* * * well understood by both of them, that is, that

the bare legal title was to be used for exchange purposes only." The findings as to Dobson were that: " * * * Dobson was informed by Williams and fully understood that the primary purpose of the deal on the 40,000 acres of Jim Smith land was a land exchange with the Federal Government." While the words, "exchange rights only" were not made a part of the written agreement, the transaction was well understood by the parties.

The question then presented is whether the words placed in the warranty deed of the Smiths, "The Grantors herein reserve unto themselves, their heirs, executors and assigns, all range use rights in all of the property * * * " were sufficient notice of intention of the parties to bind subsequent purchasers and to provide the reservation intended by the parties. According to the record of the case, there is no question but that the agreements as they affected the Smiths, Williams, dba Southwestern Realty Company, and Dobson, were for the conveyance of the exchange rights; however the plaintiffs contend that the reservation of the "range-use rights" is merely a license and, as such, does not in fact have the meaning given to it by the trial court.

It is made plain that Dobson, who had experience as a builder, subdivider, and a buyer and seller of real estate, saw an opportunity to contract for these lands and exchange them for federal lands, thereby making a sizable profit. He admitted that he did not see the lands before he made a deposit on same which, of itself, indicates that his interest was in securing the land for exchange purposes.

It is likewise apparent from the evidence that Williams, a real estate man who had been State Land Commissioner and was familiar with these exchanges, saw the opportunity to buy the lands and resell them at a profit to a third party for the purpose of making such an exchange. The release by the Smiths of their "range-use rights" in the event of an exchange to the federal government was in itself evidence that this was the purpose of the transaction. That there had been a great deal of profit made in such exchanges which made the transaction attractive is evidenced by the testimony of Dobson when he said, in referring to the release of the "range-use rights" to the government in the event of an exchange, " * * * but by this time it was too late because there had been a stink in the paper about these exchanges and they were very unpopular. * * * "

Summing up the transaction, the Smiths in their deed implemented by a supplemental release of their "range-use rights" in the event of an exchange for United States government property, conveyed to the purchaser the right to exchange this land for other United States government owned land as permitted under the Taylor Grazing Act, and in order to prevent any possibility of it being used for other purposes which would deprive them of their grazing privileges, placed in the deed a reservation of their interest in the land for "all range-use rights." These terms are well known in Arizona to be the rights for the grazing of livestock on the lands.

We cannot agree with the plaintiff that the decision in Radke v. Union Pacific Railroad Company, 138 Colo. 189, 334 P. 2d 1077, is applicable to the instant case. In this case the reservation was exclusive right to prospect for coal and other minerals. The court went on the theory that this was a right to prospect and not a reservation in the land itself.

A grantor has the right to make a reservation of an interest in real property [A.R.S. § 33–432] while providing a presumption of passing fee simple title, permits a reservation of an interest by the words " * * * shall be deemed a fee simple if a lesser estate is not limited by express words or does not appear to have been granted, conveyed or devised by construction or operation of law."

The courts have recognized many types of reservations. Snoddy v. Bolen, 122 Mo.

479, 24 S.W. 142, 25 S.W. 932, 24 L.R.A. 507 (minerals); Warner v. Patton (Tex. Civ.App.), 19 S.W.2d 1111 (oil and gas); Hicks v. Phillips, 146 Ky. 305, 142 S.W. 394, 47 L.R.A.,N.S., 878 (timber); Goodrich v. Burbank (Mass.), 12 Allen 459, 90 Am.Dec. 161 (waters); Gay V. Walker (Maine), 36 Me. 54 (light and air easement).

■ In Council v. Sanderlin, 183 N.C. 253, 111 S.E. 365, 32 A.L.R. 1527, the court in interpreting and holding valid a reservation in a deed which reserved to the grantors, their heirs and assigns, the right to hunt over the lands that may remain un-cleared and uncultivated, said:

"The right of hunting or fowling on another's lands or water may be acquired by grant or lease from the owner, either with or without the soil and with such restrictions or limitations as the owner may see fit to impose. This right, being a right of profit in the land, passes by grant or lease of the land, unless expressly reserved. Lee v. Mallard, 116 Ga. 18, 42 S.E. 372; Beckman v. Kreamer, 43 Ill. 447, 92 Am.Dec. 146; Matthews v. Treat, 75 Me. 594.

\* \* \* \* \* \*

"We understand the meaning of this conveyance to be a reservation of the right of hunting, the profit à prendre, to the grantors in fee simple as to such parts of the premises as remain 'uncleared and uncultivated,' and so long as they so remain, with power given the grantors to protect the game thereon against being hunted by any persons except the Southern Chemical Company, their executors, administrators, and assigns." 111 S.E. at 367, 32 A.L.R. at 1530.

A reservation is a right in favor of the grantor created out of or retained in the granted premises. Saunders v. Saunders, 373 Ill. 302, 26 N.E.2d 126, 129 A.L.R. 306. A grantor has the right to make a reservation of an interest in real property. Grass has been held to be part of real property. Rogers v. Ft. Worth Poultry and Egg Co.

(Tex.Civ.App.), 185 S.W.2d 165; Hamilton v. Rock, 121 Mont. 245, 191 P.2d 663; Kiehl v. Holliday, 77 Mont. 451, 251 P. 527.

In the latter case the court said:

"The grass was a part of plaintiff's real property. Real property consists of '(1) Land; (2) That which is affixed to land. \* \* \*' Section 6667, R.C. 1921. 'A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs. \* \*' Id. 6669. 'Growing grass and trees and the fruit of them, called fructus naturales, are a part of the soil of which they are the natural growth.' Anderson's Law Dictionary, 'Fructus.'" 251 P. at 528.

■ The reservation of the "range-use rights" in the instant case involved growing grass, "fructus naturales" and therefore the reservation of the "range-use rights" is a reservation of an interest in the realty. Plaintiffs contend this reservation is repugnant with the conveyance and for that reason is invalid. They state it is their contention that the reservation totally swallows up the grant.

In passing upon this question, it is necessary that we determine just what the plaintiffs received when they purchased the property. They received the legal title to the property with a reservation of the mineral rights and the "range-use rights." The release of the reservation to the "range-use rights" as against the federal government was made and recorded before the deeds of conveyance to the plaintiffs. Therefore, they had notice at the time of the purchase that they could use these lands for exchange purposes for federally owned lands which Dobson admitted was the primary purpose of the transaction. They could also use the lands for any purpose which was not inconsistent with, and which would not destroy, the "range-use rights." Some of the witnesses testified as to exceptions of hunting, fishing, and recreation under the Taylor Grazing Act. In the instant case, plaintiffs could use the land for any of these purposes if such use would not destroy or damage the "range-use rights."

108

While the value of this use alone might be far less than the purchase price, it is well known that in some locations such rights are sold. However, we are not concerned with the value of the lands. Plaintiffs point out that the Smiths bought the property for $150,000; that Williams bought it for $200,-000; and that Dobson paid $250,000.

■ The trial court in its opinion stated: " * * * I feel we have no right in this case to question the propriety or fairness of this transaction. * * *" We agree with this statement. The whole record of this case indicates that both Williams and Dobson were making the purchase for speculation to sell it to others for a profit, the primary purpose being the exchange rights. It is not for this court to say that because the transaction might have turned out to be nonprofitable, definite "range-use rights" reserved in the deed should be held to be invalid. Plaintiffs cite the case of Word v. Kuykendall (Tex.Civ.App.), 246 S.W. 757, as supporting their position. The deed in that case provided:

"'It being further provided and conditioned that the grantors reserve and retain the right to the use and possession of said acreage property for pasturage purposes until the said grantee, his heirs or assigns, shall inclose the same by a good and substantial fence.'" 246 S.W. at 758.

The court, in holding this reservation to be valid, stated:

"It is perfectly legal for parties to contract and place in their deeds certain reservations or exceptions for the use and possession of the conveyed premises as a part of the consideration thereof to be enjoyed by the grantor, his heirs and assigns, for a stated period of time. This is done constantly, and the books are full of such illustrations, supporting them. * * *" 246 S.W. at 759.

The time limit for pasturage properties in Word v. Kuykendall, supra, was until the lands were fenced. The time limit of the "range-use rights" in the instant case is un-

til the lands are transferred to the federal government. There can be no question but that the plaintiffs were put on notice by the reservation of "range-use rights" and that the Smiths were reserving the "range-use rights" on this land to preserve their cattle ranch. Plaintiffs had constructive notice of this reservation. Defendants were using the lands for grazing purposes at the time plaintiffs made their purchase.

In Roy & Titcomb, Inc. v. Villa, 37 Ariz. 574, 296 P. 260, the court said:

" * * * Practically all the authorities give assent to the proposition that the purchaser or mortgagee of land in possession of an occupant other than the holder of the record title is compelled to inquire of the occupant by what title he holds possession, or he will be held to have taken subject to whatever rights a proper inquiry would disclose the occupant had therein. * * *" 37 Ariz. at 577, 296 P. at 261.

In the instant case, such an inquiry would have revealed to the purchaser, or purchasers, all the facts in regard to the transactions, including the "exchange rights" and "range-use rights."

The facts in the other cases cited by the plaintiffs are different from those in the instant case. For example, in the case of Etz v. Mamerow, 72 Ariz. 228, 233 P.2d 442, the case turns solely on the proposition that the plaintiff had pleaded title by adverse possession; however the court rejected the title by adverse possession and granted an easement. The court pointed out that evidence to support an easement would necessarily be different from that to support title by adverse possession and that there had been no request made to the court to amend the pleadings to conform to the evidence, and reversed the case for this reason.

■ The plaintiffs state that the reservation of "range-use rights" is repugnant to the grant in that it totally swallows the grant, stating that "the purchaser paid a quarter of a million dollars for exactly nothing." We cannot agree with this contention. Certainly neither Williams nor

Dobson, when they bought the property, would have agreed that the exchange rights were "exactly nothing." It is well known that exchanges are now possible with the federal government. It is true that buyers may not be able to make the profit which was anticipated by Dobson, but as we have said, we are not concerned with whether the parties make or lose money.

We have likewise pointed out that "range-use rights" are only exclusive to the extent that the use by the purchasers does not destroy or damage the "range-use rights" of the Smiths. Their possession is not total. In Etz v. Mamerow, supra, the court recognized the difference between an easement and an adverse possession. In the instant case the use is not total. There is no question but that the lands, in accordance with the lower courts' findings, may now be used for exchange purposes and for any other purpose which does not destroy or damage "range-use rights" which were reserved by defendants. In the case of Coudert v. Sayre, 46 N.J.Eq. 386, 19 A. 190, the court said:

"* * * that when it appears by the true construction of the terms of a grant that it was the well-understood purpose of the parties to create or reserve a right, in the nature of a servitude or easement, in the property granted, for the benefit of other land owned by the grantor, no matter in what form such purpose may be expressed, whether it be in the form of a condition or covenant or reservation or exception, such right, if not against public policy, will be held to be appurtenant to the land of the grantor, and binding on that conveyed to the grantee, and the right and burden thus created and imposed will pass with the lands to all subsequent grantees: * * *" 19 A. at 193–194.

In the Coudert case, supra, reservation was made for the purpose of ensuring egress and ingress to other property. In the instant case the purpose of the reservation is not only to permit a continuation of grazing on this particular land, but to prevent fenc-ing and other uses which, as testified to, would interfere with grazing on the remainder of the ranch and thereby jeopardize its use for this purpose.

In 23 Am.Jur.2d 307, it is stated:

"§ 273. Generally.

In construing reservations or exceptions in deeds, the courts endeavor, if possible, to ascertain the intention of the parties, particularly of the grantor, from the language of the deed, and to give that intention effect if it does not contravene any rule of law. * * *"

In the case of City of Missoula v. Mix, 123 Mont. 365, 214 P.2d 212, the court in holding valid a reservation for the purpose of ingress and egress to certain adjoining property, said:

"It cannot be questioned that the grantor, being the owner of the fee, before giving his deed had a right to go and come as he will, using any part or all of the land for such purpose, and to invite, authorize, or grant permission, express or implied to anyone to transverse the land as he saw fit, or to exclude therefrom anyone entering thereon unlawfully. Such right the grantors never parted with, never conveyed, but by the reservation, retained. See Worcester v. Smith, 117 Me. 168, 103 A. 65.

"'The extent of a servitude is determined by the terms of the grant * * *.' Sec. 6754, R.C.M.1935.

*     *     *     *     *     *

"When it appears from the clear terms of a grant that it was the intent of the grantor to reserve a right, in the nature of a servitude or easement, in the property granted, for the benefit of other land owned by the grantor, no matter in what form such purpose may be expressed, whether it be a condition, or covenant, or reservation, or exception, such right, if not against public policy, will be held to be appurtenant to the land of the grantor, and binding on that conveyed to the grantee, and the right and burden thus created and imposed will pass with the lands to all

subsequent grantees. See 6 Thompson on Real Property, Par. 3505, p. 740; Coudert v. Sayre, 46 N.J.Eq. 386, 19 A. 190, and cases cited; 17 Am.Jur., 'Easements,' sec. 29, p. 942; Knotts v. Summit Park Co., 146 Md. 234, 126 A. 280; Greenwalt v. McCardell, 178 Md. 132, 12 A.2d 522, 525." 214 P.2d at 216.

■ . The reservation in the deed of the "range-use rights" is not ambiguous; the intention of the grantors, the Smiths, is ascertainable from the language of the deed which was so worded as to give any future buyers notice of the intent and purpose of this reservation.

■ We therefore hold that the reservation of "range-use rights" by the defendants, the Smiths, is valid; that they are entitled to the full and exclusive use of the lands for grazing purposes, and that plaintiffs, appellants herein, cannot fence or occupy the lands in such a way as to interfere with this right. The Smiths are entitled to relief as set forth in the judgment of the lower court.

The decision of the Appellate Court is vacated. Judgment of the Superior Court is affirmed.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and UDALL, J., concur.

NOTE: Justice LORNA E. LOCKWOOD did not participate in the determination of this appeal.