UNITED STATES of America, acting Through the FARMERS HOME ADMINISTRATION, Appellant (Intervenor),

v.

Richard REDLAND, Dorothy Redland, James Wyckoff, and John Wyckoff, Appellees (Plaintiffs),

v.

Jack C. MALMBERG, Emil A. Malmberg and Mrs. Donald Malmberg, a/k/a Sybil Malmberg, individuals, d/b/a Three Quarter Circle Land and Cattle Company (Defendants).

Jack C. MALMBERG, Emil A. Malmberg, and Mrs. Donald Malmberg, a/k/a Sybil Malmberg, individuals, d/b/a Three Quarter Circle Land and Cattle Company, Appellants (Defendants),

v.

Richard REDLAND, Dorothy Redland, James Wyckoff, and John Wyckoff, Appellees (Plaintiffs).

Nos. 83–188, 83–189.

Supreme Court of Wyoming.

Feb. 21, 1985.

---

M.L. Barton of Hill, Eichelberger, Young, Barton, Riverton, and R. Dennis Ickes (argued), Salt Lake City, Utah, for appellants (defendants) in No. 83–189.

Richard A. Stacy, U.S. Atty., Dist. of Wyoming, and Toshiro Suyematsu (argued), Asst. U.S. Atty., Dist. of Wyoming, for appellant (intervenor) in no. 83–188.

S.B. Freeman, III of McCarty, Bormuth & Freeman, Cody, and Calvin A. Calton (argued), of Calton & Hamman, Billings, Mont., for appellees (plaintiffs) in nos. 83–188 and 83–189.

Before THOMAS,[*] C.J., and ROSE, ROONEY,[**] BROWN and CARDINE, JJ.

* Became Chief Justice January 1, 1985.

CARDINE, Justice.

This appeal is from a judgment settling claims arising out of an option for the transfer of federal grazing rights. The judgment awarded specific performance and damages which included actual damages, attorneys' fees, costs and exemplary damages. The judgment also provided for subordination of a lien of the Farmer's Home Administration. The defendants, Malmbergs, and the United States, intervenor, have appealed this decision. We will affirm in part and reverse in part.

This controversy centers around the ownership of the Chapman Animal Unit Months (hereinafter called AUMs) grazing rights. The Redlands, who owned these rights, transferred their interest to the Wyckoffs on July 21, 1977, with an option to repurchase. On March 1, 1978, they reacquired 50% of the AUMs. These AUMs were attached to the base property of the Bar K–B Ranch. On September 27, 1978, the Redlands sold the ranch to the Malmbergs, retaining the Chapman AUMs. At this time the Malmbergs signed an option for purchase of the Chapman AUMs, which provided the right of purchase for six months and a right of first refusal for an additional six months. At the end of this time, the Malmbergs were to transfer the Chapman AUMs from the Bar K–B property to land to be acquired by the Wyckoffs and Redlands to which the AUMs could attach. The Bar K–B Ranch property was by now part of the Three Quarter Circle Land and Cattle Company. The Wyckoffs signed this option sometime in April 1979. In September 1979, when the option expired, the parties agreed to extend the period because the Wyckoffs and the Redlands had been unable to acquire a new base property. The Bureau of Land Management was involved in the discussions concerning the option and knew that the AUMs had been excluded in the sale even though the Three Quarter Circle Land and Cattle Company was the record owner.

** Chief Justice at time of oral argument.

On December 18, 1979, the Malmbergs wrote to the Redlands requesting that they have the grazing rights transferred from the Three Quarter Circle Land and Cattle Company by March 1, 1980 or to make some arrangement concerning those rights which would satisfy the BLM. By February 29, 1980, the Redlands and Wyckoffs had acquired a base property to which the AUMs could be attached. The parties met at the BLM office on this date to sign a grazing transfer agreement. At this time there were trespass charges against the Chapman AUMs which had not been resolved. Malmberg testified that he signed the transfer with the condition that the BLM not act on it until the trespass charges were either resolved or arrangements made so that the trespass liabilities would go with the transfer. Redland testified that he did not hear this condition. Redland testified that he offered to put the amount of the trespass charge into an escrow account, but that this offer was ignored. The concerned parties signed the transfer agreement.

After this date the BLM asked for advice from their solicitor concerning the trespass violations. He stated that:

"[I]f disciplinary action should be necessary some time in the future for this or any other adverse action, any suspensions or cancellations would be from the Three Quarter Circle Ranch grazing preference."

The memorandum also stated that the solicitor saw no reason to delay or reject any transfer of preference because of the trespass situation; that if the parties met the qualifications specified in the regulations, the transfers could be approved. When the Malmbergs found that their ranch might be liable for the trespass, they withdrew the transfer. The trespass charges were dismissed on July 22, 1981.

In the Spring of 1979, the Wyckoffs ran their cattle on the grazing lands. The Malmbergs paid the grazing fee and were reimbursed by the Wyckoffs. After the transfer was withdrawn, in April of 1980, the Malmbergs refused to allow the Wyck-offs' cattle on the grazing rights. At this time they took the position that the Wyckoffs had had a reasonable amount of time to transfer the AUMs and since they had not done this, they no longer had a right to the AUMs. At some point, the Malmbergs relied on the theory that the initial transfer from the Redlands to the Wyckoffs in 1977 terminated their interest in the AUMs by operation of law. Their theory was that grazing rights cannot be owned by one who does not own the necessary base property and therefore the transfer effectively terminated the rights. The Malmbergs used the Chapman AUMs for the grazing seasons of 1980, 1981, and at least part of 1982. On March 31, 1981, the Malmbergs traded a portion of the Chapman AUMs to the Sun Land and Cattle Co. for different AUMs. On October 10, 1981, the Malmbergs signed a lien with the Farmers Home Administration (hereinafter FmHA) against their interest in the Chapman AUMs.

The Redlands and Wyckoffs initiated this lawsuit alleging breach of contract. After the evidentiary hearing, a second hearing was held on damages. The United States intervened between the two hearings to protect the FmHA lien on the Malmberg cattle which dated from the sale of the ranch.

Appellants and appellant-intervenor have raised numerous issues on appeal, however, we find the following issues dispositive:

1. Whether a Wyoming state court has jurisdiction to settle the dispute.

2. Whether or not there was an enforceable contract to transfer the grazing rights.

3. Whether the damages awarded were appropriate.

4. Whether the court properly imposed an equitable and statutory lien on the cattle with priority over the United States' lien.

I

The Land Department of the United States, which includes the Bureau of Land Management, is vested by statute with substantially exclusive jurisdiction to

determine questions of fact, determining " * * * the disposition, acquisition, and control of the public lands, so long as the legal title thereto remains in the United States * * *." 63A Am.Jur.2d Public Lands § 39. However, state courts may enforce contracts between parties concerning public lands. 63A Am.Jur.2d Public Lands § 124. State courts have a related jurisdiction with the Land Department, " * * * they may protect a possession lawfully acquired, or restore one wrongfully interrupted, for that is a matter which is not confided to the Land Department, and may be dealt with by the courts in the exercise of their general powers. * * *" *Northern Pacific Railway Company v. McComas,* 250 U.S. 387, 39 S.Ct. 546, 548, 63 L.Ed. 1049 (1919). Appellants contend that the question to be resolved is not an interpretation of a contract, but rather whether the parties are qualified to lease federal lands under the Taylor Grazing Act, 43 U.S.C. § 315, et seq., and therefore the case raises a federal question which is exclusively within the province of the Secretary of the Interior and the federal courts.

■ In this situation, it is not necessary to decide the ultimate ownership of the Chapman AUMs as determined by federal regulations. By limiting our decision to the rights between the respective parties and determining the legal effect of the contract, we find that this inquiry does not conflict with the BLM's exclusive jurisdiction determining ownership or control of grazing rights. We note that other states have resolved questions which involve the Taylor Grazing Act when the underlying question was a contract determining the rights of various parties. *Watson v. Barnard,* 155 Mont. 75, 469 P.2d 539 (1970); *Phoenix Title and Trust Co. v. Smith,* 101 Ariz. 101, 416 P.2d 425 (1966); *Force v.*

*Peccole,* 77 Nev. 143, 360 P.2d 362 (1961). See also, *Dredge Corp. v. Husite Co.,* 78 Nev. 69, 369 P.2d 676 (1962).

## II

■ Appellants contend that there was not an enforceable contract because the Wyckoffs did not have control over the subject matter, i.e., the Chapman AUMs. They base this argument on the theory that the Redlands lost control over the AUMs when they transferred their interest to the Wyckoffs in 1977 and that this transaction terminated their rights "as a matter of law." Therefore the Wyckoffs had no interest which could be transferred in the option agreement in 1978. They cite 43 C.F.R. 4115.2–1(e)(8)(i) [1] in support of this proposition. We cannot allow appellants to attack the subject matter of the option by raising defenses which might or could have happened but did not. Possibly the BLM could have made a determination that these rights terminated; however, it did not at that time and presumably does not now regard these rights as terminated.

■ Appellants also contend that there was no consideration, mutuality or obligation; and, furthermore, the contract should be deemed illegal, impossible, and fraudulent. Whether a contract has been entered into depends upon the intent of the parties and is a question of fact. *Robert W. Anderson Housewrecking & Excavating, Inc. v. Board of Trustees, School Dist. No. 25, Fremont County, Wyoming,* Wyo., 681 P.2d 1326 (1984). At the end of the evidentiary hearing, the court found

" * * * that defendants failed to show fraud or misrepresentation as to fact or law on the part of plaintiffs, failed to establish the defense of illegality of contract, failed to establish the defense of lack of mutuality and failed to establish

---

**1.** 43 C.F.R. § 4115.2–1(e)(8)(i) states:

"(e) *Terms and conditions.*—The issuance and continued effectiveness of all regular licenses and permits will be subject to the following terms and conditions:
 * * * * * *
"(8) If a licensee or permittee loses ownership or control of:

"(i) All or part of his base property, *the license or permit, to the extent it was based upon such lost property, shall terminate immediately without further notice* from the District Manager; except that, if the licensee or permittee notifies the District Manager * * *." (Emphasis added.)

the defense of impossibility of performance. The Court also finds that there was consideration for the execution of the option agreement and finds it to be a valid and enforceable contract * * *."

The district court found consideration involved in the whole transaction concerning the sale of the ranch. There was no evidence, and we cannot speculate what particular concessions were given for the right to have the Chapman AUMs remain attached to the base property. However, we defer to the trial court's finding that the transaction surrounding the sale involved consideration for the option.

Appellants' contention regarding mutuality is based on an alleged misunderstanding of the essential terms. Whether the Malmbergs could have purchased the Chapman AUMs under the option or whether the Wyckoffs actually intended to sell the AUMs is irrelevant. This case concerns the portion of the contract regarding the transfer, and as to that element there was no mistake.

Appellants also contend that the option did not require each party to be bound to the agreement. However, in regard to the provision concerning the transfer, the Malmbergs were obligated to sign a transfer agreement and the Wyckoffs were obligated to find base property, which they did.

 Appellants contend that the option was illegal and violates public policy. Appellants base this contention on the fact that the underlying reason for the option was to allow the Wyckoffs to control the Chapman AUMs until they could find other qualified based property. They contend that this option circumvented the BLM regulations requiring that grazing privilege holders own or control base property. Contracts which are contrary to public policy will not be recognized by the court and the parties to the contract will be left as the court finds them. *Tate v. Mountain States Telephone and Telegraph Co.*, Wyo., 647 P.2d 58 (1982). However, we do not find that this contract was, per se, illegal or against public policy. The BLM, which is responsible for enforcing its own

regulations, was involved with and condoned this option and apparently acquiesces in this method of retaining the rights to grazing privileges. It is immaterial to the resolution of this case whether or not the BLM could have terminated the Wyckoffs' grazing privileges. It is also immaterial whether the BLM office would have accepted the transfer of the grazing rights. The option obligated the Malmbergs to sign the transfer agreement. It did not obligate them to be responsible for the actions of the BLM after that point. This factual situation might afford an adequate basis for cancellation by the United States. However, it does not enable appellants to complain if the United States does not cancel the rights or to attack appellees' rights collaterally. *Northern Pacific Railway Company v. McComas*, supra.

Appellants contend that performance was impossible on two erroneous assumptions: (1) that they did not have a right to be transferred; and (2) that the Wyckoffs and Redlands failed to secure qualified base property. Their argument that the "illegal" assignment of the AUMs in July of 1977 terminated them has already been answered in this opinion, and the Wyckoffs and Redlands, by February 29, 1980, had secured a qualified base property to which the rights could have been transferred.

Appellants also contend that the option agreement was tainted by fraud. In this case there was no evidence in the record of a misrepresentation of a material fact, reliance, or of damage to the Malmbergs. This is a spurious argument and has no basis in fact.

 Appellants also contend that if the contract is deemed valid, then they did not breach it, arguing that a valid tender of performance, not accepted, excuses the tendering party from performance. *Kammert Brothers Enterprises, Inc. v. Tanque Verde Plaza Company*, 102 Ariz. 301, 428 P.2d 678 (1967). The record does not support this contention. The trial court found that after the option expired in September 1979, the parties had a reasonable time in

which to transfer the AUMs. The Redlands and the Wyckoffs had obtained base property by the February 29, 1980 meeting. Appellees' offer to place the amount of the trespass liability into escrow would have protected the Malmbergs from any potential liability. The offer was not accepted. The Malmbergs did not offer a valid tender of performance and cannot now be excused from that obligation.

### III

Appellants contend that the damages were incorrectly awarded. The judgment included damages for actual expenses incurred for grazing the cattle in Texas, rather than on the Chapman AUMs, court costs, attorneys' fees, and punitive damages. The parties had stipulated to damages based on the rental value of the Chapman AUMs. At the end of the evidentiary trial, the court awarded tentative damages based upon the rental value of the AUMs. At the trial on damages, appellees presented evidence of the actual expenses spent for grazing the cattle in Texas rather than Wyoming. There was also testimony by Redland that grazing privileges were probably available in Wyoming during this time, but he did not remember if he had attempted to locate any.

We have stated that, "Compensatory damages are awarded in order to compensate an individual for a loss suffered as a result of another's failure to perform some duty. They are designed to make the individual whole— that is to place him in the condition he would have been in if the other party had adequately performed the duty owed." *Hollon v. McComb*, Wyo., 636 P.2d 513, 516 (1981).

We approved the use of fair rental value as the measure of damages where a property owner has lost the use of property. *Wheatland Irrigation Dist. v. McGuire*, Wyo., 562 P.2d 287 (1977). This is in accord with the general rule that the measure of damages for the temporary loss of property is the fair rental value of that property. *Scott v. Elliott*, 253 Ore. 168, 451 P.2d

474 (1969). See, *Nelson v. Hy-Grade Const. and Materials, Inc.*, 215 Kan. 631, 527 P.2d 1059 (1974). The damage caused by delay in performance often takes the form of loss of use of the item of property involved. "Where the property is realty, damages are generally measured by the rental value of the realty involved." 22 Am.Jur.2d Damages § 50. We have used this standard in other cases where the damage was caused by delay rather than injury. *Quin Blair Enterprises, Inc. v. Julien Construction Co.*, Wyo., 597 P.2d 945 (1979). See, *Mullinax Engineering Co. v. Platte Valley Construction Co.*, 412 F.2d 553 (10th Cir.1969). In this case, the actual damages presented were considerably greater than the fair rental value of the AUMs because additional expense occurred in shipping the cattle to Texas. We cannot find that the actual damages incurred by grazing the cattle in Texas rather than Wyoming flow from appellants' failure to timely perform under the option agreement. The parties stipulated to a fair rental value of $10 per AUM per grazing season. Therefore, damages should be awarded to appellees in a sum of $41,080 for each of the years 1980, 1981, and 1982, and subsequent grazing seasons, if any, until appellants' cattle are removed from the AUMs and the use of grazing privileges have been restored to appellees. This sum shall be calculated with ten percent interest.

Appellants also protest the awarding of court costs. Section 1–14–126, W.S. 1977, allows a court to award and tax costs as it deems right and equitable. Appellants argue that § 1–14–127, W.S.1977, is applicable. That statute provides that:

"When several actions are brought on one (1) instrument in writing against several parties who might have been joined as defendants in the same action, no costs shall be recovered by the plaintiff in more than one (1) of the actions if the parties proceeded against in the other action were openly within the state at the commencement of the previous action."

This statute is not applicable because several actions were not brought against several parties who might have been joined as defendants. Appellees brought only this action which related to the option agreement; they have not previously litigated the option with other parties and been awarded court costs in different proceedings. Therefore, this statute does not bar recovery of costs in this case.

 Appellants also question the awarding of attorneys' fees and punitive damages. As a general rule one is unable to recover attorneys' fees without specific statutory authority or a contractual obligation. *Kvenild v. Taylor,* Wyo., 594 P.2d 972 (1979); *Mader v. Stephenson,* Wyo., 552 P.2d 1114 (1976). In this case there is no statutory authority nor a contractual provision relating to the awarding of attorneys' fees. The parties entered into a written option. At that time they could have provided for attorneys' fees if they chose to do so. This was not done.

"It is one thing to interpret a contract or to discern the contractual intent of the parties pursuant to established legal rules, but it is another thing to make a contract for the parties. We are obliged to do the former, and we are prohibited from doing the latter." *McCartney v. Malm,* Wyo., 627 P.2d 1014, 1020 (1981). There is a split in authority as to whether counsel fees and other expenses in litigation may be included in estimating damages in a case where punitive damages are awarded. 22 Am.Jur.2d Damages § 168. However, we do not need to address that question because we cannot uphold the award of punitive damages.

 Punitive damages are not properly given against one who acts in good faith under an erroneous sense of duty or against a defendant who acts in good faith and under the advice of counsel. 22 Am. Jur.2d Damages § 253. In this case, the Malmbergs acted under the advice of their attorney and in reliance upon his analysis of their legal rights. They also relied upon officials at the BLM office in regard to the trespass charge and the consequence of the transfer. We do not find this reliance indicative of recklessness, wantonness, willfulness, or malice. An unjustified breach of a contract does not entitle the opposing party to punitive damages. The general rule regarding damages for breach of contract limits the award to the pecuniary loss sustained. *Modern Air Conditioning v. Cinderella Homes, Inc.,* 226 Kan. 70, 596 P.2d 816 (1979).

"[C]ourts in this country, as in most of the rest of the world, expressly reject the notion that remedies for breach of contract have punishment as a goal, and with rare exceptions, refuse to grant 'punitive damages' for breach of contract. In so refusing they confidently claim to be blind to fault, and they purport not to distinguish between aggravated and innocent breach. So Holmes said, 'If a contract is broken the measure of damages generally is the same, whatever the cause of the breach.' " (Footnotes omitted.) E. Allan Farnsworth, Legal Remedies for Breach of Contract, 70 Colum.L. Rev. 1145, 1146.

We stated in *Waters v. Trenckmann,* Wyo., 503 P.2d 1187, 1190 (1972) that in order to properly award punitive damages in an action upon breach of contract "there would have to be conduct on the part of defendant amounting to aggravation, outrage, malice or willful and wanton misconduct." We also stated that there must be evidence of spite, ill will or willful and wanton misconduct at the inception of a fraudulent contract and that the remedy for wrongful acts occurring afterwards would be compensatory damages for breach of contract. Several jurisdictions have stated the rule that punitive damages can be awarded in a breach of contract action if the conduct constituting the breach rises to the level of an independent tort. *Jorgenson v. John Clay and Co.,* Utah, 660 P.2d 229 (1983); *Temmen v. Kent-Brown Chevrolet Co.,* 227 Kan. 45, 605 P.2d 95 (1980); *Miscione v. Bishop,* 130 Ariz. 371, 636 P.2d 149 (1981).

 Appellees present no argument nor cite any cogent authority which would sus-

tain the award of punitive damages. Their entire argument consists of

"We submit with 2 Trial Judges awarding $50,000 punitive damages, the findings of 'theft' and 'outrageous' conduct are ample justification for those damages."

We cannot agree. We find nothing to indicate that at the time the option was signed that the Malmbergs did not intend to carry out their obligations under the agreement. The Malmbergs were wrong in breaching the contract. However, from a reading of the record, we do not find that appellants' conduct creating the breach rose to a level of aggravation, outrage, malice, or willful and wanton misconduct. In addition to the reasons stated, it is also apparent that an award of punitive damages cannot be here sustained because appellees did not satisfy their burden of presenting evidence of appellants' financial worth. The only evidence relating to appellants' financial status consisted of appellees' attorney asking:

"Mr. Malmberg, if you're broke as you've previously characterized yourselves to be, what difference does it make to you how much the damages are that are awarded in this proceeding? It doesn't make any difference; does it?"

and appellants responded:

"I guess I can't answer that. I don't know whether it would or not. Just a matter of trying to hang on, I guess. It would be easier to hang on if you're two hundred thousand in the hole than if you're six hundred thousand in the hole."

This is hardly sufficient to meet the requirements of a bifurcated trial establishing the factor of financial condition set forth in *Cates v. Eddy*, Wyo., 669 P.2d 912 (1983) and *Campen v. Stone*, Wyo., 635 P.2d 1121 (1981) nor the holding in *Adel v. Parkhurst*, Wyo., 681 P.2d 886, 892 (1984), which stated that: "[I]n the absence of evidence of a defendant's wealth or financial condition an award of punitive damages cannot be sustained."

IV

 The United States protests the action of the court imposing an equitable judgment lien on the Malmberg cattle with priority over the lien of the United States. The United States was granted permission to intervene between the two trials. An equitable lien is a remedial device. It is not judicially recognized until the court declares its existence and then it relates back to the point it was created by the conduct of the parties. 51 Am.Jur.2d Liens § 22. The elements necessary for an equitable lien are (1) a duty or obligation from one person to another; (2) a res to which that obligation attaches; (3) which can be identified with reasonable certainty; and, (4) an intent that the property serve as security for that purpose. 51 Am.Jur.2d Liens § 24.

 An equitable lien which does not arise from a contract is essentially a tool which is used by courts to prevent unjust enrichment. The unjust enrichment must result from the receipt of particular property upon which the lien is imposed. *Marriage of Bull*, 48 Or.App. 565, 617 P.2d 317 (1980). To give rise to an equitable lien, the parties must have intended to impress the particular fund or thing with the charge of the underlying debt. *Kinne v. Kinne*, 27 Wash.App. 158, 617 P.2d 442 (1980). It is essential to the establishment of an equitable lien or constructive trust that an identifiable res is present. *Penn Central Transportation Co. v. Consolidated Edison Company of New York*, 333 F.Supp. 81 (E.D.Pa.1971). An equitable lien is essentially a creature of equity, based on the equitable doctrine of unjust enrichment. It may be declared by a court of equity out of a consideration of right and justice as applied to the relationships involved. *Caldwell v. Armstrong*, 342 F.2d 485 (10th Cir.1965).

 The elements necessary for an equitable lien are not present with regard to the Malmbergs' cattle. The United States did not have a duty or obligation to appellees concerning the cattle. There was no intent; there was no contract; there was no unjust enrichment. We sympathize with the trial judge's motivation in attempt-

ing to create a secured judgment. However, where legal principles do not permit imposition of an equitable lien, it may not be imposed merely from a sense of justice in a particular case. *Phoenix Mutual Life Ins. Co. v. Harden*, Okla., 596 P.2d 888 (1979).

The parties have set forth some twenty-four assignments of error, all of which have been considered and disposed of by our discussion of the legal principles involved herein. Therefore, the judgment is affirmed as to appellees concerning the ownership of the Chapman AUMs and reversed in part as to damages. We affirm the original decree awarding the rental value of the AUMs to Redlands and Wyckoffs; we reverse the portion of the judgment pertaining to attorney fees and punitive damages. The judgment is also reversed to the extent that the judgment lien was given priority over the United States' lien against the Malmbergs' cattle.

Reversed for entry of judgment inconsistent with this opinion.

BROWN, Justice, specially concurring.

The sundry options and agreements regarding the Chapman AUMs are illegal. The Redlands, Wyckoffs and Malmbergs attempted to circumvent federal law. While the parties' culpability may differ in degree, none of them came to court with clean hands.

The AUMS involved here were obtained by Redland from Chapman and were attached to the Bar K–B Ranch. The Redlands attempted to illegally transfer the AUMS to Wyckoffs on July 21, 1977. Wyckoffs, however, were barred by law from holding the Chapman AUMS because they never controlled qualified base property, which is required under federal grazing law. 43 U.S.C.S. §§ 315 et seq. Grazing rights (AUMS) cannot be held in a vacuum, and can only be held in conjunction with qualified base property.

The code of federal regulations provide in part:

"(e) Terms and conditions. The issuance and continued effectiveness of all regular licenses and permits will be subjected to the following terms and conditions:

"1) The possession or control by the applicant, licensee, or permittee, of feed and forage supplies adequate, with the authorized Federal range use, to support his licensed or permitted livestock for a full year-round operation.

\* \* \* \* \* \*

"(8) If a licensee or permittee loses ownership or control of:

"(1) All or part of his base property, the license or permit, to the extent it was based upon such lost property, shall terminate immediately without further notice from the District Manager \* \* \*." 43 C.F.R. 4115.2–1.

The dealings between Redlands, Wyckoffs and Malmbergs are tainted with the illegal attempt to sever the Chapman AUMS from its supporting or base property. The parties attempt to sever the AUMS from the base property amounted to treating them as an investment by trading them on the market for profit. This is contrary to the spirit and letter of the law.

The attitude of the local office of the Bureau of Land Management (BLM) encouraged the parties (Redlands, Wyckoffs, and Malmbergs) to violate the law. The BLM knew that the agreements were illegal, but pretended that nothing irregular had happened.

No authority need be cited for the proposition that courts do not enforce illegal agreements. The trial court and the majority of this court dealt with the problem of the illegal contracts by ignoring them, or pretending that the Redland-Wyckoff-Malmberg agreements were legal, in effect, creating a fiction.[1]

---

**1.** Fiction of law: "An assumption or supposition of law that something which is or may be false is true \* \* \* an assumption, for purposes of justice, of a fact that does not or may not exist.

\* \* \*" Black's Law Dictionary 562 (5th Ed. 1979).

"It [fiction] is the creature of the court, and is moulded to purposes of justice, according to the

As a matter of expediency, in order to conclude litigation, I will also indulge in this fiction and concur in the result determined by the majority. However, I disagree with that portion of the majority opinion that purports to determine ownership of the AUMS. I do not think a state court has jurisdiction to make that determination.

ROONEY, Justice, dissenting.

The grazing rights in question were granted by the BLM. They were attached to base property of the Bar K–B Ranch. The issues in this case arise from an effort by the parties to circumvent the requirement of the BLM that the grazing rights be attached to base property. An attempt was made to place the rights in limbo until the Redlands acquired base property to which the rights could be transferred. Of record, the rights were to remain attached to Malmbergs' property, but the conflict here arose because of the efforts to thwart the BLM requirement.

Accordingly, I believe the parties come to our courts with dirty hands. I would not grant relief to any of them, but would leave them as they were. He who comes into equity must come in with clean hands. *Walker v. Board of County Commissioners*, Albany County, Wyo., 644 P.2d 772 (1982); *Takahashi v. Pepper Tank & Contracting Company*, 58 Wyo. 330, 131 P.2d 339 (1942); *Wettlin v. Jones*, 32 Wyo. 446, 234 P. 515, reh. denied 236 P. 247 (1925).

I would reverse the judgment granting specific performance and awarding damages and direct the district court to dismiss the causes presented by all parties. BLM may then concern itself with disposition of the grazing rights, hopefully as it should have done when it first received knowledge of the manipulation thereof.

view which its inventors have taken of its capacity to effect those purposes." Marshall, Cr., J.,

*Livingston v. Jefferson,* 15 Fed.Cas. (No. 8411) 660, 663 (1811).